## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **United States of America,** | : |
| **Plaintiff,** | : |
| | **: Case No. 17-CR-239-D** |
| **JERRY DRAKE VARNELL** | : |
| **Defendant** | : |

## BRIEF IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE § 2255

Comes now, Movant, **Jerry Drake Varnell**, pro se, in the above captioned cause and files this Brief in Support of Motion to Vacate, Set Aside, or Correct Sentence, under 28 U.S.C. § 2255 to vacate his conviction and sentence.

## STATEMENT OF ISSUES AND ARGUMENT

## I.    Ineffective Assistance of Counsel

Defense counsel was ineffective which created substantial prejudice against Varnell. The greatest mistake of counsel was jumping from an entrapment defense to the outrageous government conduct defense knowing full well that this specific defense is basically unheard of in the 10th circuit. Not only did they jump to a new strategy but failed to even argue sentencing manipulation after the writer of the PSR specifically argues for it. Counsel showed incompetence when they failed to argue serious prejudice concerning the pre-sting Facebook messages as evidence to prove predisposition without asking the Court to rule on the merits. The most important question to entrapment is predisposition. Therefore, the government not knowing those

1

messages existed should have foreclosed using them in trial. The government cannot be given consideration under, "expanding a criminal enterprise, when they had no knowledge of an existing crime. The government agents testified that Varnell was not committing any crimes when they began their sting and that these words were not illegal. Counsel should have also argued that the government should have been barred from drawing inferences that Varnell wanted to bomb the Federal Eccles building when evidence proved otherwise. The references to it consistently were confusing and highly prejudicial. Elisens is the only person that referred to the Federal Eccles Building and evidence refuted any knowledge of it by Varnell.

Furthermore, counsel refused to call witnesses that Varnell deemed to be important and wanted examined, including JTTF Brian Martin, Rhiannon Morrison, and UCE Mike Smith. Varnell has a right to examine witnesses against him but also has a right to produce witnesses that can aid in his defense. Brian Martin was recorded by Elisens numerous times, and those recordings prove Martin believed he was above the law. Rhiannon Morrison was present at the first few visits by Elisens and could testify about the actual ongoings and clear up a seriously muffled recorded conversation between them and that Varnell wasn't even present part of the time. It was in reference to the Eccles building, Varnell went outside to help his mother and during that time Elisens brought it up to her and according to her, she stated to him, "no your trying to blow something up". Mike Smith was another undercover informant that was tasked to give Varnell a van. Varnell refused his many offers and the prosecution not calling him as a witness should not have foreclosed Varnell's right to call him as a witness. Franklin also failed to introduce evidence from the Facebook messages that backed up his innocence.

Counsel also failed to argue that the terrorism enhancement and 18 U.S. 2332a, should be constitutionally void. The terrorism enhancement not only leads to significant additional prison time, but it is applied in an arbitrary and capricious manner. 18 U.S.C. 2332a has no mens rea element nor does it have terrorism listed in any part of the written statute. The terrorism enhancement should not be applicable to any statute based on 18 U.S.C. 2332b(5) enumeration clause. In addition, the indictments themselves fail to state terrorism as an element to the crimes charged. The enhancement adds significant time to a sentence and should be found by a jury.

> Apprendi v. New Jersey, 530 U.S. 466 (2000), "The Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. Alleyne v. United States, 570 U.S. 99 (2013), Apprendi's principle applies with equal force to facts increasing the mandatory minimum, for a fact

triggering a mandatory minimum alters the prescribed range of sentences to which a criminal defendant is exposed. *Id.,* at 490. Because the legally prescribed range *is* the penalty affixed to the crime, it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense".

Varnell's potential prison sentence was seriously increased due to the application of the terrorism enhancement. Counsel did argue during sentencing against its application since it raises a defendants criminal history level to IV regardless of past criminal history. Without the enhancement the PSR writer concluded that he had 31 total points which applies a sentencing range of 108-135 months, adding the enhancement the sentence jumps to 360-life. That is not just a small increase that is increasing the bottom range 3 times higher. In *Glover v. United States,* 121 S.Ct. 696 (2001), a unanimous Court in an opinion by Justice Kennedy held that *any* additional prison time meets the prejudice requirement of *Strickland.*

Franklin also failed to get the files from Custer County. Had counsel performed due diligence on all records for Varnell's previous case files she would have had a factual basis to stop the prosecution from prejudicing the Judge with consistently repeating that Varnell was found to be malingering in that case. The government testified early on that they received files on Varnell early into the investigation that he possibly had a mental illness. The public case file is chalked full of references to Varnell's psychotic break during that case. (Exhibit # 1) The victim and police report detail his state of mind when they were called, and instead of taking him to jail, they took him to a mental hospital. The file clearly shows that he was schizophrenic, and the Court rejected the malingering statement by requiring Varnell to stay in treatment and on medication for his schizophrenia.

Secondly, the prosecutor, Angela Marsee, also clearly stated he was mentally ill during the sentencing hearing and asked the court to make mental health treatment a requirement of his probation.(Exhibit # 2) Marsee gave the government his entire file which should have included sealed documents showing the State of Oklahoma's finding of mental incompetence and a Judge ruling him a ward of the State, thereby placing him in a State mental hospital mere days after the police took him to the hospital for a legal 48 hour hold. Then after Varnell's release his parents filed for legal guardianship over him, which the court granted. Varnell pled to a deal that would remove the case from his records after five years of probation. The mental evaluation that was repeatedly brought up by the prosecution to skew the facts in their favor is a sealed protected document. The evaluation was requested for Varnell to be deemed competent to plea to the deal offered. The evaluation was completed more than a year after his arrest and had no bearing on his mental capacity at the time of the assault. If the document is thoroughly

3

read it is clear the psychologist claims she never received any of Varnell's medical records from his lawyer. Varnell was also under pressure to pass the evaluation for the plea deal. Thirdly, the doctor that wrote the report had her license suspended at the time of the trial for misconduct. (Exhibit # 3 ) Dr. Roberson ruled on her case in front of the board. This fact was known to Franklin, but she never bothered to use any facts to dispute the prejudice. Behenna, did object to the prosecution discussing the document with the Judge the first time, but failed to bring it up on appeal. Now Varnell has protected medical information in his public record which should be a clear HIPPA violation.

Varnell asked his counsel, Franklin to file for a change of venue, and she refused. Any competent person could conclude that having a trial right next to the OKC memorial would cause substantial prejudice. The memorial is not something small and the jurors had to walk by it several times a day on their way in and out of the courthouse. The jurors also were subjected to it during lunch breaks. The memorial is a very large area which includes chairs that represent those lost including small chairs for the children. The visual of the memorial is quite impressionable to any person that simply walks by it. Holding a trial right next to this memorial caused substantial prejudice especially when the prosecution was accusing the defendant of trying to replicate that very scene.

It is almost inconceivable for Varnell to believe that Marna Franklin was colluding with the prosecution. During the trial, Franklin rested before all witnesses were called. Varnell was not in agreement with her decisions but as in many other instances Varnell was not allowed to decide anything. Marna Franklin also expressed her fear and confidence that the government was in her emails and listening to her conversations and even told Varnell's parents that she was afraid she would be arrested. Thus, why Varnell filed to have her removed from his case after the trial. Instead of removing her, the Court ruled for Behenna to be placed as lead. Even as of today Varnell has not received any case files from Behenna to help aid in this motion. After repeated letters to Behenna including a certified letter, Varnell has been ignored. Varnell was told early that if he mailed a usb stick they would put all filings on it. Varnell did this and as of this date has received nothing. Furthermore, Behenna filed Varnell's appeal and unbeknownst to Varnell, Behenna had Rachel Jordan work his appeal. The most troubling part is that Varnell was never notified from either of them about the ongoings in his appeal nor was he asked for any input. Prison records can be checked and verified that they didn't even bother to mail him the filings. Defendants are held responsible for the defects in their pleadings but in this case Varnell never was allowed any consideration from Franklin or Behenna.

4

Where is the fundamental fairness in allowing the FBI to conduct a sting that creates a scenario where every box is checked off for the longest possible sentence. The terrorism enhancement does just that. It not only starts the defendant off at a high sentencing level, but it also raises their category to the highest level. All terrorism crimes will have a life sentence range regardless of the situation. This enhancement is not a law it derives from the sentencing commissions creation of it. It should be deemed unconstitutional and cruel and unusual punishments as it is applied arbitrarily and most of the defendants who are sentenced under it are all sting victims. Had Varnell's counsel argued fruits of the poisonous tree and won maybe we would not be here today arguing the case again. She also should have motioned for a remedy under the sentencing. Even the State of Oklahoma has placed into law protections against jailhouse informants due to their unreliability.

> In *Napue v. Illinois*, 360 U.S. 264 (1959), the Court had held that the same result occurs "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." In *Brady*, the Supreme Court had held that, irrespective of the good faith or bad faith of the prosecution, suppression of material, exculpatory evidence required a new trial."

## II. Destruction of Evidence

The reliability and credibility of informers is a crucial part of police work. They rely on tips from the public to assist them in policing and keeping the public safe. However, the law is clear about the police taking tips without corroborating evidence. The law is also clear on jailhouse informants. Research shows that jailhouse informants lie and that, "Jailhouse informants have played a role in 156 proven wrongful convictions in the United States, according to the National Registry of Exonerations, which tracks both DNA and non-DNA exoneration cases.[1]

Under *Illinois v. Gates*, 1035 S.Ct. 2317 (1983), the totality of the circumstances test for an informer is based on that informer's reliability and credibility. Innocent activity of the suspects will exonerate them whereas law-breaking activity verifies the informants' statements. First and foremost, the words used to convict Varnell were from before the sting. The FBI had no real evidence to commence the sting because they only took Brent Elisens at his word. Elisens was not a seasoned informant. In fact, he was a multiple time felon who has served federal prison time for threatening to blow up the Norman Police Department. Elisens criminal history showed his aggressive nature and his propensity towards violence and grandiosity. He also had a long history of mental illness that was consistently documented in his court reports. During his initial

---

[1] "Exoneration Detail List." The National Registry of Exonerations.

meeting with the FBI, he admitted he had serious mental issues but had been on medication since his arrest and stint in jail. He was back in jail because he could not abide by the rules of his federal probation and the Judge found him to be a danger to the public and revoked. The FBI told Elisens that they would need to do a mirror image of his computer to prove that the screenshots from him were in fact truth. The FBI failed to complete this task which placed an undue burden on Varnell. The mirror image of his computer would have provided many things including Elisens IP addresses. It is a near probability that Elisens computer would have shown criminal acts as well as his proficiency for hacking. (Exhibit # 4) Elisens is a self-proclaimed hacker who even has admitted to hacking the Grady, County, Oklahoma jail mail system when he was being held on the material warrant. His website currently details the steps to get access to the internet. Agent Larsons was so excited at the possibility of catching a terrorist that he simply decided to not follow any policies. JTTF Officer Martins initial report found Varnell not to be a threat. Agent Schmidt also found him not to be a threat. Yet, somehow without any further evidence, except a case file from Custer County documenting Varnell's mental illness, Larson's decided to open a full investigation on Varnell. The government also found Varnell's go-fund me page detailing his need for research money to fund his Narnia drug.

Elisens has posted a transcript of a conversation between JTTF Brian Martin and prosecutor Matt Dillon apparently with Elisens. (Exhibit #5) This may be in evidence, but it is something Varnell has not witnessed. It is a discussion about getting a search warrant for Elisens computer since he did not allow them to get a mirror image. It seems to be a sketchy conversation that shows how devious they acted during this sting. The conversation starts with Martin asking Dillon if he can get a search warrant for Elisens computer all the while insulating him from criminal charges. Dillon then says they need to work forward then work backwards masking a search warrant under Varnell to get into Elisens computer. It is proof that the government purposely withheld evidence that could have had a potential positive impact on Varnell's defense. Bad faith from the police not preserving evidence is a violation of Youngblood[2] and they never mirror imaged Elisens computer, nor did they get a search warrant to get the card components of his FBI phone after the sting. It is also evident that they did not bother to attempt to recover any deleted material from Elisens phone. It is clear to see that Elisens did not want them to have access to his computer or his cell phone. The FBI bought Elisens a burner phone instead of giving him an FBI phone. Elisens removed the sim cards and wiped the phone before he turned it over to them at the end of the investigation. This is

---

[2] *Arizona v. Youngblood,* 488 U.S. 51 (1988), "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law".

clear destruction of evidence by the government, and it should be a reasonable inference that Elisens destroying evidence was to hide something that was favorable to the defense. All acts of bad faith. It was clear to Dillion that the mirror image and the cell phone was considered exculpatory evidence and the failure to preserve it was a due process violation.

Defense was not allowed to inspect the van and fake bomb before it was disassembled. The prosecution stated to the jury in his closing argument that Varnell connected the wires and turned the phone on arming the device but there was no evidence to prove that he did anything, except pictures of the device. Mitigating evidence was shown that proved the first cell phone call did not go through and it was not until after Agent Barry Black went by himself to inspect the device that the next two phone calls were completed. *Youngblood*, when police act in bad faith, the destruction of evidence becomes a due process violation when the evidence is exculpatory.[3] Prosecutor Dillon even went so far in his closing to say that had Varnell not armed the bomb this may be a different story. The video of Varnell driving the van and supposedly arming it was corrupted so not one shred of evidence was available. It was clear from earlier in that evening that Varnell could not remember the instructions. It almost seems impossible that while driving a van Varnell leaned over and attached two wires and turned on a tpu and activated the phone while reading the written instructions given to him by the government. Barry Black wrote the instructions and he is the agencies explosive expert. All of these items were crucial to Varnell's defense, and the prosecution filed motions to allow the destruction of evidence based on possible safety hazards by storing the material. The issue that was of great significance was not the material supplied by the FBI but the arming mechanism of the device itself. Agent Barry Black testified that he went and checked the device and that the first phone call probably didn't go through because he was in the elevator around that time. The question is that since this was a sting operation and the FBI had complete control then why would Black, by himself, need to go check the device to ensure it was armed? Because if it was not armed, as the prosecution said to the jury in his closing argument, then we would be talking about a different story here.

Appellate counsel was ineffective and failed to appeal all of the above issues during the direct appeal. Varnell did not participate in appellate pleadings or in the en banc review. Behenna not only ignored Varnell the entire time but appointed Rachal Jordan to his case without his knowledge. Behenna has also willfully denied Varnell case information to aid him in this motion and any other appeals that may arise from the facts. Varnell has moved through four different prisons since his sentencing. Varnell has been greatly discriminated against from his own counsel which has denied him the

---

[3] Arizona v. Youngblood, 488 U.S. 51 (1988)

opportunity to gather evidence to attack his sentence. (Exhibit # 7) Jordan asked for en banc review based on the argument that they had new evidence that should be reviewed. ( Exhibit # 8) The Court denied the request and the prosecution argued that any evidence they had should have been submitted to the court during trial. Varnell agrees with this argument and as stated here by Varnell both Marna Franklin and Vicki Behenna refused to allow additional testimony or evidence to be shown to prove the allegation that the FBI knew Varnell was schizophrenic before they began the sting and willfully ignored those facts.

## III.   Probable Cause for Investigation and Elicitation

Terrorism is a real threat in today's world but so is the loss of constitutional rights. What protects the innocent person from a fake police report? When does the law enforce the right to be free in one's own home from a police undercover sting that has no true probable cause to justify said sting? If the FBI did not have enough evidence to apply for a search warrant, then why is it permissible to send an informant into one's personal private dwelling to elicit criminal information?

"Probable cause exists when the facts known to a police officer "would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." Florida v. Harris , 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61 (2013). After the FBI secured Elisens release from jail they had him reconnect with Varnell. Elisens and Varnell were only internet chat friends. They never had met in person and were merely acquantiances. In the beginning of their discussion, it was due to programming and the creation of an app with another man that was also unknown to them both. After this app creation group began to go nowhere Elisens began talking to Varnell about his many Facebook profiles and Elisens even bragged to Varnell about did he look up what he did. Then Elisens told him to friend some other people who were part of a survival group. In that group it was Elisens who told them all to download text lock and to talk in an encrypted chat room. The group splintered and Varnell and Elisens continued to talk privately.

Elisens claimed that he was worried that Varnell would hurt people and that is why he went to the FBI. In his initial meeting Elisens made many statements about Varnell that were proven to be unfounded. In Varnell's case, exhibit 107-1, an unclassified document from the FBI signed by TFO Brain Martin and FBI agent Jennifer Schmitz. The document is a written record of what transpired in the first meeting. Elisens claims that Varnell was interested in starting a militia in Oklahoma, and that he had enough guns to arm a small militia. This statement was found to be untrue as the search of Varnell's trailer failed to find any guns. Elisens also claimed that Varnell gave

8

him a gun with ammunition by hiding it on the interstate for pick up on his way to New Mexico when Elisens was absconding from federal probation. He claimed he left it in New Mexico and was unable to show them the exact location of said gun. Elisens then told them that Varnell wanted to do a Murrah style attack on the federal reserve building in Washington D.C., and that he received a test message from Varnell stating this fact. The only evidence found in the messages was gps coordinates from Elisens to Varnell. No such message ever existed. Yet, the prosecution continuously accused Varnell of wanting to bomb the Federal Eccles building despite evidence in the record that showed Varnell had no clue what Elisens was talking about when it came to this specific target. Trial transcript page 332 line 9 the prosecution has Elisens reading Facebook texts from May 5th that specifically have Varnell responding "What Eccles Building". Elisens was trying his best to elicit information from Varnell that was not factual to back up his false story to the FBI.

Elisens credibility was proven to be unreliable. The Court was asked to find in favor of Varnell under outrageous government conduct and entrapment. The Court consistently came back claiming that Varnell's predisposition proved that the FBI had not entrapped him and that even though the FBI had a heavy hand in the plan Varnell's words to Elisen before the sting doomed him. References to the Eccles building were also made as factual even though not one shred of evidence proved that Varnell ever had any intention to bomb the federal Eccles building which proves how prejudicial that accusation was to Varnell. The only person that made reference to it was Elisens himself. Varnell did respond to him that he would look at it later, but no evidence was ever shown that he actually did look at it. Elisens also further testified that he was just sending it back to Varnell and that testimony was allowed even though nothing could prove it was truthful. Not only was it allowed it was the prosecution that pushed for Elisens to consistently explain away his bad behavior, a *Giglio*[4] violation. The FBI not getting the mirror image of Elisens computer when they were at his parents' home as they stated they would do should have foreclosed their investigation. They had no proof that Varnell had any intentions to commit an act of terrorism. All they had was screenshots from Elisens that had no author and evidence that Varnell was a schizophrenic.

Facebook messages from November 23, 2016, to November 26, 2016 show that Elisens had text Varnell saying, "its rare to find someone whose down for anything to make this earth better, make use of". Yet the FBI failed to decrypt this message for the

---

[4] *Giglio v. United States*, 405 U.S. 150 (1972), "noting that deliberately deceiving the trial court and jury by presenting evidence known to be false had been held to be incompatible with the "rudimentary demands of justice"

9

evidence record. Then on the day Elisens ran off the 26th Elisens wrote Varnell asking him to swing by as he needed help removing his gps from his ignition. Elisens then called Varnell at 2:03 p.m. but Varnell declined to answer. (Exhibit # 8) These messages prove that Varnell did not leave a gun for him on the interstate and that Elisens wasn't too worried about him trying to blow up anything. It shows that when Elisen asked Varnell to help him remove a gps, even though he said yes, he could help, he simply ignored him when he was in his area. It is not a far-reaching idea to say that Elisens lies allot when it suits his needs. Had the FBI actually took a mirror image of Elisens computer then maybe we could provide evidence that Varnell didn't write those damning messages. Elisens had his passwords and could have easily logged into his account and placed them there. Lastly based on:

*Florida v. J. L.,* 529 U.S. 266 (2000), After an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun, officers went to the bus stop and saw three black males, one of whom, respondent J. L., was wearing a plaid shirt. Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm or observe any unusual movements. One of the officers frisked J. L. and seized a gun from his pocket. J. L., who was then almost 16, was charged under state law with carrying a concealed firearm without a license and possessing a firearm while under the age of 18. The trial court granted his motion to suppress the gun as the fruit of an unlawful search. The intermediate appellate court reversed, but the Supreme Court of Florida quashed that decision and held the search invalid under the Fourth Amendment.

*Held:* An anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. An officer, for the protection of himself and others, may conduct a carefully limited search for weapons in the outer clothing of persons engaged in unusual conduct where, *inter alia,* the officer reasonably concludes in light of his experience that criminal activity may be afoot and that the persons in question may be armed and presently dangerous. *Terry* v. *Ohio,* , 30. Here, the officers' suspicion that J. L. was carrying a weapon arose not from their own observations but solely from a call made from an unknown location by an unknown caller. The tip lacked sufficient indicia of reliability to provide reasonable suspicion to make a *Terry* stop: It provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. See *Alabama* v. *White,* 496 U. S. 325, 327. The contentions of Florida and the United States as *amicus* that the tip was reliable because it accurately described J. L.'s visible attributes misapprehend the reliability needed for a tip to justify a *Terry* stop. The reasonable suspicion here at issue requires that a tip be reliable in its

assertion of illegality, not just in its tendency to identify a determinate person. Pp.269-274. 727 So. 2d 204, affirmed.

## IV.   Illegal Search and Seizure

Is it legal for a government agent to go into one's private dwelling to elicit information of a crime? *U.S. v.* Jones, 565 U.S. 400 (2012), "The Fourth Amendment provides in relevant part that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." It is beyond dispute that a vehicle is an "effect" as that term is used in the Amendment.

> *United States v. Chadwick*, 433 U. S. 1, 12 (1977). It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information." *Jardines v. U.S.* 569 U.S. 1 (2013), When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "un- doubtedly occurred." *United States v. Jones*, 565 U. S. ___, ___, n. 3 (2012) (slip op., at 6, n. 3). By reason of our decision in *Katz v. United States*, 389 U. S. 347 (1967), property rights "are not the sole measure of Fourth Amendment violations," *Soldal v. Cook County*, 506 U. S. 56, 64 (1992)—but though Katz may add to the baseline, it does not subtract anything from the Amendment's protections "when the Government does engage in [a] physical intrusion of a constitutionally protected area," *United States v. Knotts*, 460 U. S. 276, 286 (1983) (Brennan, J., concurring in the judgment)."

Under *Jardine's*, "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." There are many cases that have peered into informants' actions and whether they are considered under a third-party doctrine test. Most of these cases deal with persons that are dealing drugs from their homes. The courts have consistently stated that if one is committing a commercial illegal business from their home then it is open to the public. That the 4th amendment does not apply to them by their illegal actions. In the instant case at hand, Varnell was not engaging in any illegal activity. His home was not open to the public for illegal trade nor had anyone made any observations that he was attempting to build any bombs. Not one shred of evidence was shown that Varnell was engaging in illegal activity and the FBI did not have probable cause for a search warrant. It can also be inferred that the FBI didn't even have reasonable suspicion that Varnell was engaging in illegal activity outside of Elisens accusations. There were no exigent circumstances, *Katz v. United States*, 389 U.S. 347 (1967), determined that the 4th amendment protects people and coined the commercial

11

business phrase and stated that an informant must pass muster and be credible and reliable to attain a search warrant. Mere suspicion is not enough to convict and in *Katz,* the government did not intrude into a home they put a phone tap on a public telephone booth to gather information of criminal wrongdoing.

A government informant who specifically goes into a mans home to elicit information of criminal wrongdoing for the purpose of gathering evidence is a warrantless search. Elisens was sent into Varnell's home with a watch that recorded his conversations for the FBI to build a criminal case against him because they had no evidence of wrongdoing. *U.S. v. Danhauer,* 229 F.3d 1002, 1006 (10th Cir. 2000), "When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant. See *United States v. Sturmoski,* 971 F.2d 452, 457 (10th Cir. 1992). In this case, however, the affiant neither established the veracity of the informant, nor obtained sufficient independent corroboration of the informant's information. The only police corroboration of the informant's information was the affiant's verification of the Danhauer residence's physical description,". In this case Varnell was compelled to be a witness against himself by the government in his own private home when they sent Elisens into his home to elicit information of criminal wrongdoing.

When an informant acting as a government agent is sent to gain incriminating information from a suspect under *Massiah v. United States,* 377 U.S. 201, 84 S. Ct. 1199 (1964) this is deemed deliberate elicitation. If 6th amendment protections take place after an indictment is filed, then how is it fair that the government can create a case against a person from a tip received from an unreliable witness who has no credibility? There must be protections for citizens against governmental interference unless true probable cause has been established.

> *Escobedo v. Illinois,* 378 U.S. 478 (1964), "Nothing we have said today affects the powers of the police to investigate "an unsolved crime," *Spano v. New York,* 360 U.S. 315, 327 (STEWART, J., concurring), by gathering information from witnesses and by other "proper investigative efforts." *Haynes v. Washington,* 373 U.S. 503, 519 . We hold only that when the process shifts from investigatory to accusatory - when its focus is on the accused and its purpose is to elicit a confession - our adversary system begins to operate,". In *Gideon v. Wainwright,* 372 U.S. 335 , we held that every person accused of a crime, whether state or federal, is entitled to a lawyer at trial. The rule sought by the State here, however, would make the trial no more than an appeal from the interrogation; and the "right to use counsel at the formal trial [would be] a very hollow thing [if], for all practical purposes, the conviction is already assured by pretrial examination." *In re Groban,* 352 U.S. 330 , [378 U.S. 478, 488]".

12

> *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996), "However, in some cases a search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment "if the government coerces, dominates or directs the actions of a private person" conducting the search or seizure. *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir.1989). In such a ease, the private citizen may be regarded as an agent or instrumentality of the police and the fruits of the search may be suppressed. In some affirmative way, the police must instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment. See *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir.), cert denied, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985).

The case law is clear that when a person is an actual suspect their constitutional rights are protected and vested under the constitution and due process of law. Yet, the FBI is allowed to send a government agent into one's private home to induce incriminating evidence through elicitation. The Courts have always deemed a confession to be fruit of the poisonous tree if the defendant was not read Miranda or if they asked for a lawyer and was refused. As shown earlier *Florida v. J.L.*, a tip that has not been proven reliable cannot be the basis for a *Terry* stop and if the search yields evidence it is fruit of the poisonous tree. Most sting cases that involve home searches are drug cases and the defendants are in fact selling drugs from their home and the informant is either a drug buyer or an undercover. They are a commercial establishment, and the rules are different, and they cannot be compared to the case at hand. Here Varnell was not conducting any illegal business from his home. Varnell was not even committing any terrorist acts. Varnell was a law-abiding citizen before the FBI made him a criminal. However, without encroaching into his home they could not build a case on him. Which is exactly the definition of elicitation from a government agent and illegal search and seizure which is unconstitutional. Yet, Varnell didn't always invite Elisens over, in fact, as the case began to drag out and Varnell's parents told Elisens he was not allowed back on the property, Elisens simply showed up to push Varnell. When Varnell was not doing as the government wanted then Elisens was tasked with pushing him harder which proves the illegal search and seizure and elicitation of information to prosecute Varnell.

Furthermore, Varnell's parents owned the land and the trailer of Varnell's residence. Varnell did not pay rent and it cannot be construed that he had equal property rights just because he lived on the property. It is a parent-child relationship that is the defining characteristic. When the Varnell's explicitly told Elisens he was not allowed back on their property then the FBI was on notice that when they returned, they were illegally trespassing and were committing an illegal search and seizure. Varnell's parents had legal guardianship over him and that further extended their rights to protect their property and son from the FBI to elicit incriminating information without true

13

probable cause. *Meyer v. Neb.*, 262 U.S. 390 (U.S. 1923,) "wherein the court held that the State cannot, under the guise of exercising its police power, interfere with guaranteed liberty interests". Varnell's parents have a constitutional right to parental autonomy, this right further extends the right to deny access to any person they felt were unduly influencing their son, especially when their son is schizophrenic (mental defect) and they have legal guardianship over him. If Varnell shared the property with another equal co-tenant of whom paid rent equally then they would be considered co-tenants. In this situation the case law is clear that Varnell's parents specifically denying the right of Elisens to return to the property, under the recognized hierarchy showing of superiority of the parent-owner-child-resided, would be a trespass and an illegal search.

> *Georgia v. Randolph*, 547 U.S. 103 (2006), the Supreme Court *Held:* "In the circumstances here at issue, a physically present co-occupant's stated refusal to permit entry renders warrantless entry and search unreasonable and invalid as to him. Trespassing laws are simple, they have been well established and so has illegal searches. In fact, a co-inhabitant naturally has an even stronger claim. No sensible person would enter shared premises based on one occupant's invitation when a fellow tenant said to stay out. Such reticence would show not timidity but a realization that when people living together disagree over the use of their common quarters, a resolution must come through voluntary accommodation, not by appeals to authority. Absent some recognized hierarchy, *e.g.,* parent and child, there is no societal or legal understanding of superior and inferior as between co-tenants. Disputed permission is no match for the Fourth Amendment central value of "respect for the privacy of the home," *Wilson* v. *Layne,* 526 U. S. 603, 610, and the State's other countervailing claims do not add up to outweigh it. fine line must be drawn to avoid undercutting *Matlock*—where the defendant, though not present, was in a squad car not far away—and *Rodriguez*—where the defendant was asleep in the apartment and could have been roused by a knock on the door; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not part of the threshold colloquy, loses out".

The courts are clear that if a co-tenant refuses to a search, then the police must obey that co-tenant. The rules also say that if the objecting co-tenant is not home then it is permissible in certain circumstances. The FBI continued to send Elisens back to the Varnell property despite him being told explicitly that he was not allowed back by the parents who owned the property. The FBI continued pursuit of Varnell and invited themselves during many visits. There is no work around a property owner/parent child hierarchy. In fact, the FBI made sure to have Elisens ask to use the bathroom in the main house. Elisens asked Varnell if he could use the bathroom and Varnell responded that he could inside the trailer, but Elisens stated he needed to do more than urinate, so

he asked to specifically enter the main house of which Varnell consented. This situation was used for two purposes, first, to prove consent and control by Varnell himself unto the parent's property and second, to prove that Varnell had access to his parents' house for purposes of the future search warrant. In fact these facts are used in the search warrant for the FBI to gain access to the entire property. This established the necessity for the FBI to violently raid the Varnell's home unreasonably after his arrest. It also establishes bad faith that the FBI knew they had legal issues concerning the property but created a work around to justify their need to send Elisens back to the property. Not only was Elisens trespassing as a government agent under *Smythe*, but that trespass constituted an illegal search under *Jardines* for the purpose of eliciting incriminating information under *Messiah*.

The FBI's own policies attempt to protect innocent persons from illegal searches from being under full investigation by stating that[5]:

> b. Full Investigations i. Predication Required for Full Investigations A full investigation may be initiated if there is an articulable factual basis for the investigation that reasonably indicates that a circumstance described in paragraph 3 .a.-.b. exists or if a circumstance described in paragraph 3 .c. exists. V. AUTHORIZED METHODS A. PARTICULAR METHODS All lawful investigative methods may be used in activities under these Guidelines as authorized by these Guidelines. Authorized methods include, but are not limited to, those identified in the following list. The methods identified in the list are in some instances subject to special restrictions or review or approval requirements as noted:
> 12. Physical searches, including mail openings, in conformity with Rule 41 of the Federal Rules of Criminal Procedure, the Foreign Intelligence Surveillance Act, or Executive Order 12333 5 2.5. A classified directive provides additional limitation on certain searches.
> 4. The following activities may not be authorized: a. Acts of violence. b. Activities whose authorization is prohibited by law, including unlawful investigative methods, such as illegal electronic surveillance or illegal searches.
> B. EMPLOYEE: an FBI employee or an employee of another agency working under the direction and control of the FBI.

> Based on FRCP Rule 41, the FBI is authorized to get a search warrant fore the following:

> (c) **Persons or Property Subject to Search or Seizure**. A warrant may be issued for any of the following:

> (1) evidence of a crime.

[5] https://www.justice.gov/archive/opa/docs/guidelines.pdf

(2) contraband, fruits of crime, or other items illegally possessed.

(3) property designed for use, intended for use, or used in committing a crime; or

(4) a person to be arrested or a person who is unlawfully restrained.

Guidelines on Undercover Operations June 18, 2013[6]:

(3) Prohibitions: An undercover employee shall not: (a) participate in any act of violence except in self-defense; (b) initiate or instigate any plan to commit criminal acts except in accordance with Section V (concerning avoidance of entrapment) below; or (c) participate in conduct which would constitute unlawful investigative techniques (e.g., illegal wiretapping, illegal mail openings, breaking and entering, or trespass amounting to an illegal search).

Is it truly legal for the FBI to send in an undercover employee to induce information of illegal activity. Based on the FBIs on words from their website it is not.[7] Are FBI special agents permitted to install wiretaps at their own discretion?

No. Wiretapping is one of the FBI's most sensitive techniques and is strictly controlled by federal statutes. It is used infrequently and only to combat terrorism and the most serious crimes. Title 18, U.S. Code, Section 2516, contains the protocol requiring all law enforcement officers to establish probable cause that the wiretaps may provide evidence of a felony violation of federal law. After determining if a sufficient showing of probable cause has been made, impartial federal judges approve or disapprove wiretaps. The approving judge then must continue to monitor how the wiretap is being conducted. Wiretapping without meeting these stringent requirements and obtaining the necessary court orders is a serious felony under the law.

To obtain a warrant for a wiretap on phones the government must show that the phone is being used to conduct criminal activity. Therefore, it would seem impermissible for the government to be able to have an undercover informant go to a person's private home with the specific intent to record their conversation inside the home without a warrant. Eliciting information from the unwary person of interest to gather incriminating statements. In *Katz v. United States*, (1967), the Court held that the wiretapping of public phone booths for listening to conversations without a warrant, regardless of no physical trespass taking place, was unconstitutional.

However, in a ruling that has been noted as pushing back on certain mass surveillance activities, the Supreme Court in *Carpenter v. United States,* 138 S.Ct. 2206 *(2018)* ruled that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through cell-site location information. What is a

[6] https://www.ignet.gov/sites/default/files/files/guidelines-undercover-operations-june-2013.pdf

[7] https://www.fbi.gov/about/faqs/are-fbi-special-agents-permitted-to-install-wiretaps-at-their-own-discretion

wiretapping? According to TechTarget[8], "Wiretapping is achieved either through the placement of a monitoring device informally known as a bug on the wire in question or through built-in mechanisms in other communication technologies. Enforcement officials may tap into either for live monitoring or recording."

The Supreme Court as of late has been critical of the new technology that has emerged and has begun limiting the use of it. Arguments of an expectation to the right of privacy is prevailing regardless of the governments belief that the person is engaged in criminal activity. Cell-site location records must require a search warrant and so does gps monitoring of a person's vehicle, *U.S. v. Jones*, 565 U.S. 400, (2012).

If Elisens tips were credible then there was no need to send him into Varnell's home. They could have continued corresponding online just as they did previously. It was when the FBI was not getting anything from Varnell that they made the decision to send Elisens into his home to push him. Upon the first visit nothing was found and Varnell had already made it clear that he had calmed down after the election was over. Elisens kept trying to engage Varnell into some talks about doing something and Varnell's only answer was there's this drug I want to create. Varnell had no issue with the government and at this point it had been approximately five months since their last conversations. An undercover employee shall not: (b) initiate or instigate any plan to commit criminal acts. The record was clear that when Elisens began communicating with Varnell as an agent of the FBI to build a case for them that Varnell was doing absolutely nothing illegal. Varnell also was no longer worried, and he had moved on. The proof of that is Elisens own words during the first meeting. Varnell asked "what Eccles building?" and had no plans to do anything and no targets.

Elisens along with the FBI initiated and instigated the plan to bomb a bank. Without the Facebook record of Varnell's written words they had not one ounce of evidence of what Varnell truly said. The plan all originated from what Elisens told them he said. Excluding those words, it is easy to see that they created this crime based on lies by Elisens and they supplied everything.

> The Fifth amendment states: No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law;.

**Compel** verb compelled; compelling Synonyms of *compel transitive verb*

[8] https://www.techtarget.com/whatis/definition/wiretapping

: to drive or urge forcefully or irresistibly.

The definition completes the argument that when they sent Elisens into Varnell's home, it was for the very purpose of compelling Varnell to act on his ACCUSERS accusations because Varnell was under criminal investigation by the FBI. Not being a witness against yourself on the stand should not be the only meaning to that very detailed sentence. One can invoke the 5th on the stand to not be compelled to testify against oneself. But the sentence does not say only in criminal trials. It simply says against himself in criminal cases. That is the difference between actors that are in an ongoing criminal enterprise. These actors living is based on their own criminal acts and undercover officers buys of illegal drugs from a home business is much different then an accused that is doing nothing illegal and has no criminal enterprise running from their home.

The recordings of Varnell in his home should have been deemed illegal search and seizure. They are fruits of the poisonous tree. If this practice is allowed without any true evidence of a crime, then the government has free reign to do whatever they want. This is probably why so many innocent men and women are dying at the hands of corrupt officers and why the public is not only outraged by the atrocities that are splashed all over the news, but they no longer trust the government[10].

**Public trust in government near historic lows**

Chart | Data | Share

CLICK AND DRAG IN THE PLOT AREA TO ZOOM IN.

% who say they trust the government to do what is right just about always/most of the time



PEW RESEARCH CENTER

CLICK LEGEND ITEMS TO REMOVE THEM FROM CHART

What are the remedies for police when they flagrantly violate one's constitutional rights? In cases where police misconduct is particularly egregious, broad, "blanket" suppression may be warranted even without a causal connection between the

---

[10] Public Trust in Government: 1958-2022 | Pew Research Center

misconduct and the evidence. "Blanket suppression" is typically reserved for instances where officers completely ignore a warrant's limitations and treat a search as a general "fishing expedition," rummaging through property for any indication of broad criminal activity. *See United States v. Webster*, 809 F.3d 1158 (10th Cir. 2016) (blanket suppression is warranted where searches conducted pursuant to a warrant turn into general searches in disregard of the particularity requirement); *United States v. Le*, 173 F.3d 1258, 1270 (10th Cir. 1999); *United States v. Moraga*, 76 Fed App'x 223, 229 (10th Cir. 2003).

The actual search of Varnell's parents' property did not render any evidence that Varnell was building bombs or planning to do anything concerning bombs. Items that were taken that were not used at trial included Varnell's cell phone, his laptop, and his parents HD camera drive system. Varnell's parents have asked for the items to be returned through counsel, Vicki Behenna, but requests have largely been ignored. Furthermore, the raid on Varnell's parents' home should have been placed into the evidence to prove the aggressive tactics of the FBI which should have been introduced under the outrageous government conduct argument. Varnell's parents did write Marna Franklin and Vicki Behenna an email discussing the raid, including refusal by the FBI to give them a copy of the search warrant and complained about the abuse of power and the FBI rummaging through their home, the FBI cuffing Varnell's parents and not allowing them to get dressed and dragging them outside down their driveway scantily dressed to police cars. (Exhibit # 9) Along with complaints that the FBI terrorized Varnell's youngest sister who was 14 years old who was awakened by FBI agents with guns held on her to slowly get up out of bed with her hands up. Behavior that should be considered intolerable in a civilized society when the FBI knew the parents had no clue what was happening and were not involved in in their bomb plot. No safety concerns existed nor exigent circumstances.

"Those who would give up essential liberty to purchase a little temporary safety deserve neither liberty nor safety."
*Benjamin Franklin, Speech to the Pennsylvania Assembly, November 11, 1755*


## V. Evidence Not Presented to Disprove the Accusation

Varnell's case should be looked at as a unicorn. It is a case where two mentally ill men were chatting online, and both began to fear that a civil war would be coming. The prosecution hammered in on the text from Varnell about finding someone to be on his team. Elisens tried his best to get Varnell to discuss his team after he started talking to him again in March of 17. However, there was no team and Varnell and Elisens had different interpretations for what team meant which is why the one text in Varnell's

Facebook doesn't make allot of sense. The, "I am going after government officials when I have a team", seems out of place. Varnell's Facebook records show a conversation string with an existing friend. However, it had nothing to do with going after officials or doing anything illegal. He was inviting him to the group meeting, and it was all very innocent. (Exhibit # 10) Marna Franklin should have used the conversation string to rebut the prosecutions assertions that Varnell was trying to create a team to insinuate that he was looking to create his own group of terrorists. Defendants exhibit 27 shows Elisens pushing Varnell about if he has candidates for his team of which Varnell responds nope. Then Elisens says "I know a couple...". This is not Varnell creating anything, it is Elisens creating evidence from nothing and one of Elisens attempts to initiate a plan.

The reason why this point is important is because the prosecution misconstrued facts by asserting their point of view to conversations to make everything look very damming. Varnell told Elisens he found a like-minded guy, Elisens replied for your team. The word team always came from Elisens. Just like the word bunker was made up by the FBI. Storage container just didn't sound all that convincing. Misinformation and psychological manipulation of the information was quite abundant in this case. For instance, another questionable text found in the conversation string with Elisens is Varnell saying he also can get stun guns and Elisens replies, "for those out-of-control bullies", Varnell replies back CATTLE. Misdirection of words is easy to do with text messages. Without the actual facial expressions, the voice changes, it is easy to misinterpret something into something that it is not. According to Psychology today, "Without any information other than words—typically, very few words—the meaning we make out of the cryptic electronic messages we receive is necessarily shaped by our own feelings and expectations. Consequently, what we believe is being said may have very little to do with what the author wishes to communicate.[11]"

Elisens also testified that he had numerous Facebook profiles to protect his girlfriend because her family did not approve of him. He had many profiles indeed but it's hard to believe it was to protect someone else. Elisens responded to Varnell, "who doesn't" when Varnell asked him why he had so many fake names, and its more reasonable to believe that during the first conversation's Elisens was in fact hiding his identity due to his probation conditions. It would be assumed that Elisens online activity was monitored and that any hateful rhetoric would impact negatively upon him after threatening to kill so many people. Yet, the prosecution really liked the innocent version of it because they pushed it, and Franklin should have found out what his probation terms were before the trial so she could have called the lies out.

---

[11] Why Is There So Much Miscommunication Via Email and Text? | Psychology Today Feb. 15, 2015

Evidence was presented to show that Varnell had ordered labels. Evidence was presented that Varnell was wanting to make a drug called Narnia. Defendants exhibit 27, April 23, 2017, an entire month after Elisens began talking to Varnell again, after Elisens offered to build Varnell's team and Varnell declined, Elisens asked how do we make this world better, and Varnell tells him about the drug he wants to invent. The record is clear that Varnell told Elisens he wanted to make this drug. He even asked Elisens if he knew of any big drug dealers. The problem with Varnell's drug research was that he had no money and no real knowledge. Varnell had a go-fund me page up asking for research money. Varnell sent numerous emails to people asking for money for his research. Varnell told his friend Deshawna about the drug.(Exhibit # 11) The Daily Oklahoman even printed Facebook messages between them where Varnell told her he was trying to free people of mind control with the drug. Varnell also told her that the FBI would come after him and he would have to protect his family. Rhiannon Morrison sent the FBI copies of emails he sent from her accounts asking people for money for research. All witnesses Franklin refused to call regardless of Varnell's insistence. Morrison would have been a great witness to back up Varnell's story that Elisens was the aggressor wanting to bomb something. Varnell agreed initially with Elisens not for bomb making but to acquire chemicals to make his Narnia drug. Franklin refused to put it on as evidence because "she didn't want the jury to think he was crazier than he already was". It is not that far fetched if you read the messages without the preconceived notion that Varnell was in fact trying to make a bomb. When looking at the early conversations Varnell even asked for matches, possibly thousands of matches. Why would you need matches to make a bomb? In fact, most people reading what Varnell said would question his sanity. This includes the FBI agents, when they already knew he was mentally ill. Probably why the FBI required Agent Larsen's to attend CIT training after the trial. If there was a person that could acquire all bomb making ingredients there would be no point in needing thousands of matches.

The first message that seemed to be so important was Varnell saying I guess I'm making anhydrous ammonia. The needing thousands of matches was for the red phosphorus, and he also said he needed Acetone. Throughout the sting Varnell stayed dedicated to making his Narnia drug. There are comments from him and messages that state just that. Elisens, as the informant controlled exactly what went to the FBI and exactly what he wanted to control for himself. A self-professed hacker who claims to have extreme high intelligence that's trying to build a case against someone for money and to get his outstanding cases to go away. To get paid he MUST make accomplishments, so if he continues to go back empty handed, he gets nothing. This is the greatest threat to democracy, that the FBI is legally able to hire convicted felons, violent or not, to actually be the only person controlling the evidence. Would it be far-fetched that Elisens was working two different deals but only sending what parts sounded good to his handlers? Once the Professor came into the picture things got

much murkier. When Varnell realized he would never actually get his hands on the chemicals he didn't know what to do. Therefore, he ignored, he played the game in hopes just maybe he would get them because he never intended to bomb anything.

Yet, the thing no one has gave any thought is that Varnell believed this was real. How would real bombers react if someone just backed out? It's unlikely they would be very happy about it and its unlikely that if they are willing to kill others, they would kill him. No one thought about where Elisens was on the night of the bombing. Elisens was supposed to be there, he is the one that pushed to do this and Varnell was not supposed to drive that van, Elisens was supposed to drive it. Yet, they still got him to do it by power of persuasion through fear. Elisens was not someone to mess with and Varnell knew his history and capabilities.

Most sting cases the subject supplies something. Maybe its money, they later claim entrapment based on the low price of the guns, or its nails and harmful things to make the bombs nastier. This case is the unicorn, as Varnell supplied nothing, he had no plan, the FBI created the plan, they supplied everything, they picked the date, the time, and the location and ran out last minute and bought the van. Without the actions of the FBI this would have never happened. The Court convicted Varnell on predisposition, words written on Facebook messages months before the FBI initiated the sting. Words that can be misconstrued easily and words that can be planted by a hacker. Page 45 of 123 in evidence of the decrypted texts, the version that Varnell has shows the message that sent the GPS coordinates to the Federal Reserve building has no password. It claims to be content according to cipher. Very interesting considering all the others have the password shown and the FBI had Elisens password.

Raul Bajunda, FBI supervisory agent held a media press conference about the arrest of Varnell and repeated to the public many of the lies Eric Larsen stated in the affidavit for the search warrant. Larsen claimed that the informant was reliable, and he was unaware of any false information that he had supplied to them. His lies began with Varnell claimed to have a "bunker" for when the world collapsed[12]. That this bunker was outfitted with furniture with power running to it and lights on which was multipurpose with food supplies and that Varnell concocted his plan for this bombing in that bunker. (Exhibit # 12) Larsen also referred to the Federal Reserve building, stating it had five stories above ground and one story below ground and that he was unsure how many offices or people the building held, even though the recorded conversations proved that was untrue. Larsen also failed to point out that they, the FBI themselves, had to supply everything and chose the date and target. Larsen filed for the search warrant two days before the night of the bombing when Varnell was ignoring them, and they knew he had

---

[12] Pictures of bunker attachment #

not gotten a van or any other supplies and was telling Elisens he was sick. Franklin should have called Bajunda and questioned Larsen about his lies in his sworn affidavit.

Mike Smith should have been allowed to testify or at the very least forced to give a statement that could have been used as testimony to ensure the jury knew without a doubt that Varnell was offered a box truck by a like-minded individual and refused it. Not only did he refuse it Varnell never tried to bring him into the operation. Varnell said many things that were used against him, the prosecution pushed to the jury that he was trying to build a team based on Elisens accusations. Smith's testimony would have given mitigating evidence that this was all untrue. (Exhibit # 13)

## VI.    FBI Manipulation

Varnell's entrapment defense and his outrageous government conduct argument was refused based on predisposition. The Supreme Court has made it clear that the Government must prove they knew the defendant was predisposed before they started the sting. Varnell had spoken about things in 2016 to Elisens through Facebook messenger and their communications stopped the end of November 2016. When Elisens began communications again with Varnell in March of 2017 Varnell was clear that he had calmed down and wasn't worried anymore. That was not enough for the FBI so they continued pursuit of Varnell through aggressive tactics by having Elisens push him by constantly asking him questions trying to spur a response to get him to say anything that backed up Elisens many lies to the FBI. The Federal Eccles building lie and statements about the "bunker" is a great example of it. Varnell had no clue what Elisens was even talking about when he brought it up numerous times and after Elisens realized he was going nowhere with it he jumped on other targets. The Court constantly allowing the prosecution to continuously push Elisens accusations without evidence of fact was highly prejudicial.

United States v. Mosley, 965 F.2d 906, 909 (10th Cir. 1992). "When the government's conduct ... is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct." Id. at 90 "The government may not `engineer and direct the criminal enterprise from start to finish.'" Mosley, (quoting United States v. Ramirez, 710 F.2d 535, 539 (9th Cir. 1983)).

Varnell had no known criminal characteristics from previous crimes that would attach to a terrorism case. Elisens did in fact have a previous federal conviction for threatening to blow up the Norman Police Department McVeigh style. There was no real individualized suspicion of Varnell as noted in the two separate assessments made by

two different FBI agents. The only thing they had was a tip from Elisens that were screenshots that could not be proven to be written by Varnell. The FBI's failure to get a mirror image of Elisens computer foreclosed the ability to conclude that Varnell did in fact author the messages. The only change was the FBI receiving information from another case that Varnell was mentally ill. Terrorism cases are allowed allot of leeway due to the circumstances of the potential crime. However, to open a full investigation, based on FBI policies, the FBI needed to have an articulable suspicion to open said investigation. A lower standard then actual probable cause. The Courts have been clear that for an officer to stop and frisk a person they must have true probable cause. Mere suspicion doesn't cut it when a person's liberty is at issue.

United States v. Pedrin, 797 F.3d 792 (9th Cir. 2015), appealed to the **United States Supreme Court** but was denied **certiorari** on May 31, 2016. "As we suggested in Black, the question is not whether a defendant in fact "may have been predisposed to commit a stash house robbery." Id. at 306 n. 9. Rather, it is whether the government had reason to believe, in light of what it knew as it was setting up the sting, that a defendant was so predisposed. If Black was less than clear on this point, we make it clear today: What the government learns only after the fact cannot supply the individualized suspicion that is necessary to justify the sting if the government had little or no basis for such individualized suspicion when it was setting up the sting. The majority correctly concedes that "[w]hat the government learns only after the fact cannot supply the individualized suspicion that is necessary to justify the sting." Maj. Op. at 9–10. What did the ATF know about Pedrin before it approached him? The majority does not say. The record says that the ATF knew nothing. It was a shot in the dark when the ATF enlisted Pedrin as a co-conspirator. The majority speaks of a different defendant, Omar Perez, when at page 8 it addresses the question. What the ATF knew of Perez establishes nothing as to what the ATF knew about Pedrin. Once enlisted, Pedrin recruited others, sketched a scenario for the robbery, and obtained walkie-talkies and scanners. As the ATF had already selected Pedrin as a player in its imagined robbery, none of this activity had any significance. The ATF was already at work with Pedrin cast by the agency as a co-conspirator. As the case now stands, the ATF enhances its reputation by its successful ruse. The government of the United States is diminished by its dependence on the duplicity of the agency. Because of a choice made by Pedrin or his counsel, entrapment was not argued and Jacobson was uncited. By the rules governing litigation we can affirm Pedrin's conviction. By our commitment to a humane justice, we are called to dismiss the case made by the entrappers".

24

*Jacobson v. United States*, 503 U.S. 540, 112 S. Ct. 1535 (1992), "The prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by government agents." Id. at 549, 112 S.Ct. 1535. The timing of the defendant's disposition is critical: "The sole issue is whether the Government met its burden of proving that petitioner was predisposed to violate the law before the Government intervened." Id. at 549 n. 2, 112 S.Ct. 1535.

The Government must know that the defendant was predisposed before they intervene, not after the arrest. In the instant case the Government through subpoenas lawfully acquired evidence from Facebook messenger that could be used against Varnell to show predisposition. But they didn't acquire that until after the sting. What they learn after the fact is not evidence that makes the sting lawful. *Pedrin* didn't argue entrapment instead he argued outrageous government conduct, but the Court gave him the out because they see humanity. Varnell was given an entrapment jury instruction and argued outrageous government conduct by the FBI. But the Court continuously used words written in the Facebook conversations as evidence of Varnell's predisposition and did not give a jury instruction that the predisposition must be known to the FBI before it can intervene. Varnell's case resembles Pedrin's as to the facts of how the sting started, the informant, Perez, knew him, and he collaborated with the ATF to concoct the sting. Pedrin had participated in previous drug robberies, but it was unknown to the ATF until after they created the sting. Varnell's case is better on the merits because the FBI had no knowledge of the Facebook conversations that showed predisposition until after his arrest. The point of the case is that if the government does not know of the predisposition, they cannot legally obtain a conviction after the fact. Without Varnell's Facebook conversation string and the government's bad faith failure to get a mirror image of Elisens computer they had no evidence to anything that Varnell may have truly said to constitute the sting. Elisens providing them with screenshots that could not prove who authored them is NOT evidence of a crime committed by Varnell or is it evidence of predisposition. The FBI created the entire sting based off Elisens accusations that Varnell wanted to bomb the Federal Eccles Building which proved to be false. *Pedrin,* should be controlling precedent for sting cases based on the Supreme Courts denial of certiorari to the government. This clear error created substantial prejudice against Varnell because even if the Facebook messages were legally admitted, the fact that the government did not have them before they initiated the sting meant they could not be used to establish predisposition.

*Jacobson*, "beyond reasonable doubt that the defendant was disposed to commit the criminal act prior", and "The timing of the defendant's disposition is critical", and "proving that petitioner was predisposed to violate the law before the Government intervened". Thus, when you look at *Jacobson* and read it exactly as it is worded it seems clear that the 9th circuit in *Pedrin*, has defined **disposition** correctly. That in

order for the government to run a sting where they devise the crime with a plan they concocted they must have facts that the suspect will be ready to engage in the fake crime **because the** suspect is already involved in that type of criminality. Jacobson had ordered child pornography magazines when they were legal, after they were deemed illegal, the government bombarded him with letters and catalogs trying to get him to buy something in order to arrest him. He finally acquiesced and bought a magazine and subsequently was prosecuted for it. The Supreme Court's ruling was based on the government's actions not Jacobson's.

Varnell was not committing any crimes when the government came knocking on his door. Regardless of the things he said to Elisens months prior to their sting, they were simply words and does not mean that he would have ever violated any laws. In fact, weight should be given to the fact that Varnell never said anything to anyone other than Elisens and Varnell was clearly doing nothing wrong when they entered his life. Speech no matter how repugnant to some readers is just that, its speech, which used to be free in our Country. *Jacobson*, "As for the evidence gathered during the investigation, Jacobson's responses to the many communications prior to the criminal act were at most indicative of certain personal inclinations and would not support the inference that Jacobson was predisposed to violate the Child Protection Act. On the other hand, the strong arguable inference is that, by waving the banner of individual rights and disparaging the legitimacy and constitutionality of efforts to restrict the availability of sexually explicit materials the Government excited". Further quotes from *Jacobson*. They stress a few words, those engaged in criminal enterprises and the government may not originate a criminal design and then induce the commission of the crime to prosecute by inciting the suspect.

"Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells* v. *United States,* 287 U. S. 435, 441 (1932); *Sherman,* 356 U. S., at 372; *United States* v. *Russell,* 411 U. S. 423, 435-436 (1973)."

"In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute. *Sorrells, supra,* at 442; *Sherman, supra,* at 372."

Furthermore, *Sorrells* makes clear that a ruse that incorporates a sting is legal if the suspect is already engaged in illegal acts. The prosecution kept pushing that Varnell's previous words of hyperbole to his like-minded friend, that were written months before the sting constituted the proof that he wanted to actually bomb something, so that mattered the most. Everyone simply ignored the facts that the FBI created the

26

entire plot and the FBI supplied everything, and the FBI drove Varnell everywhere to commit the crime so they could prosecute him for the crime they manufactured. They were merely words written to one person, and those words may have proven that Varnell was predisposed to threaten to do some things, or proof that he had issues with the government, but the words were not proof that Varnell would in fact bomb a bank. Varnell also spoke to Elisens about hacking the federal broadcast alert system and data centers. If the Court agrees with *Pedrin,* and the Facebook messages can not be used as proof of predisposition because the FBI had no true knowledge of them then the list from *Black* must be examined without using any of the words Varnell wrote previously.

> *Jacobson*, "The prosecution's evidence of predisposition falls into two categories: evidence developed prior to the Postal Service's mail campaign, and that developed during the course of the investigation. The sole piece of preinvestigation evidence is petitioner's 1984 order and receipt of the Bare Boys magazines. But this is scant if any proof of petitioner's predisposition to commit an illegal act, the criminal character of which a defendant is presumed to know. It may indicate a predisposition to view sexually oriented photographs that are responsive to his sexual tastes; but evidence that merely indicates a generic inclination to act within a broad range, not all of which is criminal, is of little probative value in establishing predisposition."

The Courts last words in *Jacobson* was, "We simply conclude that proof that petitioner engaged in legal conduct and possessed certain generalized personal inclinations is not sufficient evidence to prove beyond a reasonable doubt that he would have been predisposed to commit the crime charged independent of the Government's coaxing." Very importantly is that on May 5th, Agent Martin was talking to Elisens in a recorded conversation, audio file 3, 16 minutes 30 seconds long. Martin says, "don't limit yourself to putting him in front of a Toyota, if he wants a Ryder truck filled with 1000 pounds of ammonium nitrate and fuel oil and det cord, that's possible, we can do that." At this point there is no plan until that moment when Agent Brian Martin created it by telling Elisens what to do. Martin continued stating, "do a small test out in a field in Sayre, small bomb, he gets so excited he jacks off right there in front of everybody. Then we provide him with a Ryder truck, and it's got 10 barrels of ammonium nitrate." Elisens texts to Varnell that day were a direct result of this conversation with JTTF Agent Brian Martin. On May 9th, according to the trial transcript page 510-511, Elisens met with FBI Agent Larsen's where Elisens tells him that he believes Varnell was just venting but not prepared to act.

Eager to join a plan would not be defined as the suspect fails to plan and fails to reply after visits where the FBI are forcefully pushing a plan. The only plan that has been established is by the FBI and Elisens because after their conversation and Elisens

text to Varnell nothing was happening without Elisens driving to Varnell's home and implanting thoughts into his mind.

Elisens incitement and coercion was not only from the words spoken to Varnell but also from the many post on Facebook about the enslavement of Americans to work slave labor jobs for tax revenue generating purposes. Elisens is non-stop on his ideals about the world. (Exhibit # 14) Elisens has published books on amazon and has several websites, a YouTube channel, and documents on social media all in his real name. If Varnell was eager to bomb something it would have been clear at this point. There would be no need for surprise visits or to push him harder. Elisens then sent Varnell a link to the biggest 5 data centers in the world and told him to pick one at the direction of the FBI. Then on June 15th after meeting with the professor Elisens told the FBI that Varnell was non-committal, page 528 line 9. Elisens started on Varnell on March 15th and now three full months later it was clear to even Elisens that Varnell was all talk and did not want to commit to anything real, exhibit 54.

What should be clear is that the FBI were the ones pushing the conversations of building a bomb based on Agent Martins early specifics. The bomb that was built was exactly what he told Elisens to not limit himself with, a truck with a thousand pounds of ANFO. It is also very clear, that Varnell has absolutely no clue about the Federal Eccles Reserve building and any discussion with Elisens about it. It is also extremely clear that the bombing plan originated with the government.

Varnell request that if entrapment must be barred then this Court should entertain a sentencing manipulation argument and reduce Varnell's sentence by using the PSR's recommended sentencing range. The 10th Circuit and this Court opined that the FBI were overly involved in making this crime happen. Thus, if it is not outright entrapment or outrageous government conduct then sentencing entrapment/manipulation should have been found especially when the government chose everything. They have the knowledge to understand how sentencing works. For instance, the value of the building targeted adds points to the sentence. In Varnell's case the building they chose added 22 points which is a substantial increase. In the instant case the 10th Circuit found, "Admittedly, the government played a substantial role in the plan by providing all the materials necessary to complete the bomb and nearly all the expertise. There is no denying the FBI's investigation in this matter was aggressive and its participation in constructing the bomb and choosing a target was extensive."

U.S. v. Medel, No. CR 10-1738 JB, 8-9 (D.N.M. Oct. 25, 2011)

"Sentencing-factor manipulation, also called sentencing entrapment, can serve as the basis "for a variance based on [18 U.S.C.] § 3553(a)'s requirement that a district court consider the 'nature and circumstances of the offense.'" United States v. Beltran, 571 F.3d 1013, 1018-19 (10th Cir.

2009). The United States Court of Appeals for the Tenth Circuit analyzes claims of sentencing-factor manipulation under a standard of "outrageous governmental conduct." Unlike some Circuits, the Tenth Circuit does not apply a strict definition of conduct that qualifies as sentencing-factor manipulation, but rather applies the more amorphous "outrageous governmental conduct" test. *United States v. Beltran*, 571 F.3d at 1018-19 (noting that the United States Courts of Appeals for the First and Eighth Circuits apply sentencing-factor manipulation "in extraordinary cases when the government improperly engages in conduct to expand the scope of a crime"). This outrageous governmental conduct standard assesses whether "considering the totality of the circumstances, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice.

The FBI supplied everything to build the destructive device to ensure a possible life conviction for Varnell. 18 U.S.C. 2332a, would not have been applicable to Varnell without the mighty hand of the government. In fact, testimony proved that Varnell would not have been able to acquire the ANFO nor any of the other components. Varnell did not supply anything for the crime, and he did not supply the money. The FBI tasked Elisens to get a message from Varnell to ensure the terrorism enhancement would apply. The facts are that without the FBI this crime would have never happened. That is sentencing entrapment at its finest. Varnell, was tasked to supply buckets or barrels, fake identification, and get a van. No evidence was shown that Varnell attempted to get a van. Not only did he not attempt to get a van as directed but when the FBI sent in another informant named Mike Smith, who offered him a box truck he declined. Had Varnell had true intentions of bombing anything he would have eagerly jumped at the opportunity to acquire the box truck from Mike Smith. The fact that Varnell was not complying with the directions given to him, it did not deter the FBI or make them stop to think they were entrapping Varnell into a crime. Varnell declined Smiths offer and barely wrote him back no matter how many attempts Smith made to prove to Varnell that he was a like-minded individual and would even consider something shady. Facts that have been continually ignored.

People say many things but that does not mean they will act on it. Look at January 6th, many people gathered to protest and stormed the Capitol violently. Yet, none of them received a long prison sentence. According to Politico[13]:

Of the dozens of people who have been sentenced, fewer than half have received prison time for their actions in the days surrounding the riot.

---

[13] https://time.com/6133336/jan-6-capitol-riot-arrests-sentences/

That's in part because many of those sentenced so far were only convicted of illegally entering the Capitol building and were not involved in the more violent and destructive aspects related to storming the building. Only seven defendants have been sentenced for felony charges, as of late December.

Among those defendants who are being incarcerated, their stints in prison are often somewhat brief. The median prison sentence was 45 days, as of Jan. 1. On several occasions judges have expressed misgivings about whether the actual criminal charge matches the misdeeds of the defendant. Beryl Howell, the D.C. court's chief judge, in late October said that prosecutors' approach is "almost schizophrenic" given the cavernous gap between their characterization of the insurrection and the terms of the plea deals they're negotiating.

Many stings by the FBI have included individuals that are plotting to attack the Capital and they receive an average sentence of 25 years. The FBI creates stings and target specific individuals and they make sure all the boxes are checked for the conviction. Even though these protestors committed an attack, and the government can research their Facebook pages and gather other evidence from people they don't have it all wrapped up in recordings. The PSR easily found the terrorism enhancement because the FBI made sure it was there. The PSR also found that sentencing manipulation was a factor and the writer requested that a review committee be allowed to review the case, denied. The writer of the PSR suggested a level of 31 with the sentence being 131-188 months, by not applying the highest category level for sentencing as the enhancement states they must do. PSR officers do not normally find these facts, and that report should be weighed in the evidence in favor of Varnell's request under sentencing manipulation.

The Government initially charged Varnell with 844(i) which carries a maximum sentence of 20 years if you committed it. Then they offered him a plea deal of 15 years with the threat that if he did not accept it, they would bring a WMD charge against him under a superseding indictment and go after a life sentence. He declined and 8 months after his arrest they brought the superseding indictment. This is why most sting cases end in a plea deal because that threat happens every time. How far is the government allowed to go to imprison people for crimes they set up? Subjects that commit these crimes barely get 5 years. The only people facing a life sentence under the terrorism enhancement are sting cases. Real cases get very little time and defendants that cooperate with the FBI and get others arrested receive the lightest sentence. Therefore, if you really bomb something and nobody gets hurt your looking at a few years and if you're a part of an organization looking to dismantle the government and get caught up

in a sting you get just a few years after you cooperate and get your friends arrested. Varnell didn't have the luxury of cooperating as the only persons he knew that were setting up a bomb plot were FBI agents.

A good example is in 2019, Paul Rosenfeld of Tappan was sentenced to 16 months in prison Friday for building a 200-pound, high-powered bomb in his basement last year with plans to become an Election Day suicide bomber on the National Mall in Washington, D.C., his case was not a sting, and he has a confirmed mental illness.

Next is, Spencer Wayne Allen, 26, was sentenced today before District Court Judge Curtis V. Gomez to 93 months of imprisonment for his convictions of arson and malicious damage and destruction to federal property, United States Attorney Gretchen C.F. Shappert announced. Judge Gomez also sentenced Allen to 3 years of supervised released, 300 hours of community service, and a $300 special assessment.

In 2020, Jarrett William Smith, an ex-soldier described by prosecutors as a satanist and linked to a neo-Nazi group was sentenced Wednesday to 2½ years in federal prison for distributing information through social media about building a bomb and making napalm. A federal judge rejected a request from Jarrett William Smith's attorney for a lenient sentence of 15 months in prison followed by three years of supervised probation. Federal law called for a sentence of up to 20 years in prison and a fine of up to $250,000, but sentencing guidelines said the presumed punishment for a first-time offender like Smith was 2½ years to a little over three years in prison.

Seth Aaron Pendley, 28, was arrested in April after attempting to obtain an explosive device from an undercover FBI employee in Fort Worth. He pleaded guilty in June to malicious attempt to destroy a building with an explosive and was sentenced today to 10 years by U.S. District Judge Reed C. O'Connor.

Benjamin Ryan Teeter, 24, of Hampstead, North Carolina, was sentenced today to 48 months in prison followed by five years of supervised release for conspiring to provide material support and resources to Hamas, a designated foreign terrorist organization, for use against Israeli and U.S. military personnel overseas, announced U.S. Attorney Andrew M. Luger. Teeter admitted that he and Solomon again met the UCE on August 29, 2020. During this meeting, the defendants gave the UCE a 3-D printed "auto sear" believing that the auto sear would be used by Hamas to convert semi-automatic rifles into fully automatic rifles. At this time, Teeter

and Solomon agreed to obtain, and did obtain, another order of auto sears for the CHS and the UCE. Michael Robert Solomon, 31, of New Brighton, was sentenced today to 36 months in prison followed by five years of supervised release. These guys worked for the FBI to take down the Boogaloo bois.

At a protest in Brooklyn, Colinford Mattis, a 35-year-old graduate of Princeton University and New York University Law School, had been an associate at Pryor Cashman when nationwide protests raged in the wake of George Floyd's murder on May 25, 2020, was sentenced to one year and one day in prison. His co-defendant, tenants' attorney Urooj Rahman, received a 15-month sentence in November. Both have been disbarred. "Mattis and Rahman used a separate group chat to discuss the use of weapons and violence to pursue social change," the government's sentencing memo states. "In their discussion, Rahman expressed the view that 'all the police stations' and 'probably all the courts' 'need[ed]' to be burned down." They met at a 7-Eleven convenience store shortly before midnight, where they bought glass Bud Light beer bottles and toilet paper for makeshift Molotov cocktails. Mattis drove a minivan to the NYPD's 88th Precinct Stationhouse, and Rahman ignited and tossed the homemade incendiary device through the smashed window of the NYPD sedan around 1 a.m. on May 30, 2020, prosecutors say. Brooklyn federal court Judge Brian Cogan admonished Urooj Rahman before handing down the 15-month sentence, calling the firebombing an "attack on the rule of law" carried out by someone who took an oath to uphold the Constitution. At a hearing in 2021, prosecutors read a series of text messages exchanged between Rahman and Mattis, revealing the pair joked about burning down police headquarters and courts over nearly a 24-hour period. "I hope they burn everything down," Rahman told Mattis in a message hours before protests formed. "Need to burn all the police stations down… probably all the courts too." When Rahman joined protesters that night, she wrote to Mattis: "Throwing bottles and tear gas … lit some fires but were put out … fireworks goin and Molotovs rollin."

Samantha Shader, a demonstrator who admitted to hurling a Molotov cocktail at an NYPD van occupied by four cops during the 2020 George Floyd protests in Brooklyn was sentenced to six years in prison Tuesday.

Ivan Hunter, a self-described member of the Boogaloo Bois has been sentenced to more than four years in prison nearly two years after shooting more than a dozen rounds into a police building during the George Floyd protests in late May 2020. "Hunter admitted to the CHS that he had fired his AK-47 into the precinct building in Minneapolis, had helped set the structure on fire, and had participated in looting.

Erfan Salmanzadeh, a 33-year-old naturalized citizen of the U.S. born in Iran, pleaded guilty on Monday to use and attempted use of a weapon of mass destruction. Mr. Salmanzadeh admitted to law enforcement that he used homemade triacetone triperoxide (TATP) to blow up an Xbox in his back yard on July 26, 2021. At the time, he claimed he wanted to see how much damage such an explosion would cause. Law enforcement later reviewed his electronic devices, including a video Mr. Salmanzadeh recorded on July 22, 2021, threatening to blow up a local high school. "We are going to blast the school," he said in Farsi, before displaying the nail bomb filled with shrapnel, the suicide vest filled with pipes labeled dynamite, a suitcase filled with container labeled explosives, and a backpack filled with bottles labeled explosives to the camera. Plea deals maximum sentence is 15 years.

Nahibullah Zazi pleaded guilty in 2010 to an Al Qaeda-inspired plot to attack the subway. He was released after **9 years**, federal sentencing guidelines indicated he should serve life in prison, but his sentencing was delayed again and again as he cooperated with authorities. According to a sentencing memo from prosecutors filed this February, he provided "extraordinary" assistance, including evidence that led to the conviction of his two closest friends and testified at trials in the United States. Prosecutors said he had met with the government more than 100 times while in federal custody and had "directly contributed to the prosecution of numerous individuals." Zazi spent his teenage years and young adulthood living in Queens. Al Qaeda recruited him and two of his best friends to carry out a "martyrdom operation" on U.S. soil after the three traveled to Pakistan in 2008.The mission called for rush-hour suicide bombings on packed subway lines, timed to occur during the Muslim holy month of Ramadan and on the eighth anniversary of the Sept. 11 terror attacks. The plot, foiled by federal authorities, **represented "one of the most serious terrorist threats to our nation" since 9/11,** then-Attorney General Eric Holder said.

## VII.    Terrorism Enhancement and Sentencing Enhancement

Varnell was sentenced using the terrorism enhancement as an upward departure. The terrorism enhancement is an enhancement under the sentencing commission guidelines, §3A1.4. A "federal crime of terrorism" is defined as an offense that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and "(B) is a violation of . . . [18 U.S.C. §§] 844(i) . . . [or] 2332a." Neither of these statutes have terrorism as an element. In fact, 2332a, has no mens rea, it simply states without lawful authority. 844 (i) has a mens rea element that falls under maliciously. Congress did not write a law that establishes the enhancement instead Congress directed the Commission to create an enhancement

33

under chapter three adjustments for specific cases. The enhancement should be deemed cruel and unusual punishment because it creates arbitrary sentencing due to the criminal history level category being automatically raised to VI and adds 12 points to the base level, which significantly increases the sentence.

In the instant case at hand Varnell's sentence without the enhancement would begin at a base level of 24 under 2K1.4, arson with no cross-reference. Varnell's criminal history adds 2 points which would subject him to a sentence of 70-87 months. Varnell's base level of 24 accounts for the knowingly reckless endangerment of others so no other enhancements should apply. If you add potential property damage to this scenario under the cross reference of 2B1.1 then the sentence becomes even higher. 2K1.4 adds 2 points to 2B1.1 and the prosecution opined that the value of the building they chose was more than 250 million dollars. Commentary under the loss has a provision for calculating the loss value, "(C) Estimation of Loss.—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. § 3742(e) and (f).The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

(i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property."

Bancfirst and the Skirvin recently sold and the sale price of both was much different than what the prosecution claimed.(Exhibit # 15) The prosecution calculated losses of over two hundred fifty million dollars but in total the buildings sold for a little under forty three million. The prosecution basis o2B1.1 starts at 7 points and then adds 28 for the value of the property and adds 2 more points for the reckless disregard of harm totaling 39 points, creating a sentencing range of 292-365 months. The defense and the PSR writer disagreed with the prosecution on the value of the building and asked for a downward departure for mental illness and ended with a total point level of 31 for Varnell with a range of 131-188 months.

Once the terrorism enhancement is added it automatically increases the base level to 51 points which changes the sentence to life under the prosecutions value. If you add it to the 31 then you end with 43 points which also leads to 360- life. The loss cross reference to § 2B1.1 falls under part B basic economic offenses, (Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligation of the United States). The statutory index for statute 2332a is under 2K1.4 Arson, property damage by explosives. This is where the question should be asked if that was the intent of Congress? The sentencing guidelines chapter two creates the sentencing work up of specific crimes. Chapter three includes enhancements to account for upward or downward departures depending on how the crime was committed. When Congress added 2332a, the penalty was any years to life, or death. This is a wide latitude in sentencing. The crimes that can be prosecuted under this statute are extremely broad, from threatening to harm to actually blowing up a building and killing many. If the intent of this penalty was to ensure fairness in sentencing based on the underlying facts and the sentencing commission set the points at a high range of 24 then it should be a reasonable inference that 2B1.1 cross reference should not apply. Just as in murder cases, each level of homicide has a specific sentencing range based on the underlying facts. If one were to bomb a building and commit first degree murder, then they would receive the death penalty. Burglary and robbery using a weapon also differentiates the sentence based on brandishing or using a weapon. If Congress intended for everyone to receive a life sentence under this statute, then it would have written that in its penalty. Instead, they started with any years, meaning a sentence of one year is possible. Therefore, the terrorism enhancement and 2B1.1 should not be applicable to these crimes. 844(i) has the same base levels and the maximum term of imprisonment is twenty years. Therefore, an attempt would lead to a sentence of 70-87 without 2B1.1 cross reference. Using the cross reference, the prosecution asks for brings it to 39 without the terrorism enhancement and ends with a sentence of 292-365 months, way beyond the maximum of 240 months for committing the crime.

Does "intended loss" mean "loss". Under 2B1.1, the loss table states loss, but the commentary has a provision that "loss" also means "intended loss".

USA v. Banks, Docket No. 19-03812 (3d Cir. Dec 09, 2019), Court Docket, "We need not decide, however, whether one clear meaning of the word "loss" emerges broadly, covering every application of the word. Rather, we must decide whether, in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word "loss" is the loss the victim actually suffered. We conclude it is. Because the commentary expands the definition of "loss" by explaining that generally

"loss is the greater of actual loss or intended loss," we accord the commentary no weight. Banks is thus entitled to be resentenced without the 12-point intended-loss enhancement in § 2B1.1."

*U.S. v. Lonich*, 23 F 4th 881, 918 (9th Cir. 2022), "loss enhancement-the government must show the defendant caused the bank to fail".

The Supreme Court's decision in *Kisor v. Wilkie*, 588 U.S. ___ (2019), The court explained that a court must "exhaust all the 'traditional tools' of construction," including the "text, structure, history, and purpose of a regulation," and determine that the regulation is genuinely ambiguous before relying on the application notes. A court must exhaust the test and structure of the guideline before relying on the notes."

Therefore, under *Kisor*, Varnell asks this court to determine what intended loss under 2B1.1 actually means. Under attempt there is a difference between a bomb exploding and one being fake. As a fake bomb can never explode to create any loss, but a real bomb can explode but not create the loss the person intended. There have been numerous cases of hoaxes and threats where the persons intent was to create fear without intending to create any losses. Meaning that loss can only be applied if an actual monetary loss by a victim can be proven since 2B1.1 falls under Larceny, Embezzlement, and Other Forms of Theft. Varnell's case had zero losses and no victims. 2B1.1 is based on offenses against personal loss. Based on *Banks*, the commentary section has no weight and the cross reference to 2B1.1 should be inapplicable to Varnell because no loss occurred. The commentary expanded the definition of "loss" to add intended loss and it sweeps more broadly than the plain language of the guidelines interpretation and must be deferred. The court should find that the law's actual text cannot be changed by the sentencing commissions comments.

The terrorism enhancement also has many issues in its wording. The prosecution must prove that the defendant was in fact trying to retaliate against the government and in most cases they cannot. Therefore, sting cases most always have the enhancement applied to them because the government has set it up to ensure that the defendant either made a video declaring their intent or wrote a statement. Not only that but the cross reference to the property damage also seriously increases the range. If a court does not know the target or cannot prove the actual intended target, then the points are not added. Congress should have directed the commission to write a sentencing guideline versus an enhancement to cover terrorism due to the broad range of crimes they enumerated under 18 U.S.C. § 2332b(g)(5)(B. The terrorism enhancement should be ruled unconstitutional when it is only a small percentage of persons that it is applicable too and it creates arbitrary and capricious sentencing.

18 U.S.C. 844(i) is another perfect example of the arbitrary use of the enhancement. The statutes maximum term is 20 years, therefore Varnell could only receive a 20 year sentence, the same as a person who actually bombed a building. Under, 18 U.S.C. 2332a the sentencing range is any number of years to life. This is where the enhancement is allowed to get off the rails and always ends in a life sentence range for sting defendants. Under *Kisor*, a Court is to no longer use the deference standard by asking an agency for it to decide its ambiguous rules if its presumptions do not hold up. As held in *Banks*, the guidelines specifically say "loss", it is the commentary that creates the loophole that loss is the same as intended loss. The court ruled that the commentary was not binding to the guideline. Looking at 3A1.4 commentary, it is ambiguous.

> **4. Upward Departure Provision.**—By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996, the adjustment provided by this guideline applies only to federal crimes of terrorism. However, there may be cases in which (A) the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct but the offense involved, or was intended to promote, an offense other than one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); or (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. In such cases an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied.

Under 4.A, it specifies that a crime may still be terrorism even though it may not be enumerated under 18 U.S.C. § 2332b(g)(5)(B). Yet, if it is enumerated under 18 U.S.C. § 2332b(g)(5)(B) and the motive was towards a civilian population and not against the government then the enhancement should not apply. Or it could mean that the motive was to specifically target the government for retaliation, meaning the motive was not to target a civilian population, then the sentence cannot be raised above the top guideline range. Under, *Ansberry,*[14] the 10th Circuit opined that to apply the terrorism enhancement the court must find that the defendant was retaliating against some specific government conduct. Varnell's case was considered targeting the government even though the prosecution went back and forth stating that he wanted to start a revolution. Therefore, in the case at hand there was no evidence that Varnell was targeting the government to retaliate against anything done to him by the government. His charges are enumerated under 18 U.S.C. § 2332b(g)(5)(B), and the question

---

[14] *United States v. Ansberry*, 976 F.3d 1108 (10th Cir. 2020)

becomes if he was targeting a civilian group of people, based on his call to arms by the people to stand up then who was he actually targeting? Under that theory his sentence could not be higher than the top guideline range without the terrorism enhancement applied. Meaning that without 2B1.1 his sentence range would be based on 26 points and 70-87 months. If you add 2 B1.1 then it becomes 39 under the prosecutions loss calculations resulting in 292-365 months. Basing it on the PSR USPO calculations of 31, we would be at 121-151 months. Maximum time would be 12.6 years. Both enhancements are arbitrary and capricious in the way they excessively add time to sentences.

The enhancement is not found by a jury and the only requirement for its application is that a Judge makes a finding by the evidence that it was an intended act of terrorism by the defendant. 18 U.S.C. 2332b(g)(5)(B), list the crimes that are considered federal crimes of terrorism. 18 U.S.C. 2332b is titled as acts of terrorism crimes that transcends national boundaries, covering crimes of the person and crimes against property by arson. The statute is applicable to any person that may be targeting a building or federal personal that has transcended national boundaries. For instance, a person on a travel visa that was conspiring with IS to bomb an American embassy would fall under this statue. The government uses the crimes listed under 5(b) of this statute to make the terrorism enhancement applicable to all crimes that it has enumerated under this statue as crimes of terrorism. This should be ruled unconstitutional because Congress should not be able to add an element to a crime under a separate statute that is not charged in the indictment. Varnell's indictment has no reference to terrorism.

Also, under 18 U.S.C. 2332b(g)(5)(B), there is a list of penalties for crimes committed under that statute. This is where this becomes very confusing, because these penalties are not used by the sentencing commission for the enumerated crimes. For instance, as in Varnell's case, under (E) for destroying or damaging any structure, conveyance, or other real or personal property, by imprisonment for not more than 25 years; (F) for attempting or conspiring to commit an offense, for any term of years up to the maximum punishment that would have applied had the offense been completed. If the defendant bombed the building and injured a person, the maximum time is 30 years. Therefore, under this statute even if the terrorism enhancement was applied the maximum sentence Varnell could have received is 25 years, the prosecution could not have argued for life. It is hard to believe that Congress' intent was to punish crimes committed in America harsher than a foreigner overseas.

Looking at the statutes under section 18 U.S.C. Part 1 Chapter 113B 2332, it is titled criminal penalties and does not reference anything about terrorism but states the penalty maximums under this chapter not section. This statute revolves around crimes to nationals of the United States outside of the United States and gives a maximum

penalty of twenty years for attempted murder. 2332a was added in between 2332 and 2332b to add crimes against persons or property within or outside of the United States by use of a WMD.

weapon of mass destruction:

(2) the term "weapon of mass destruction" means— (A) any destructive device as defined in section 921 of this title ; (B) any weapon that is designed or intended to cause death or serious bodily injury through the release, dissemination, or impact of toxic or poisonous chemicals, or their precursors; (C) any weapon involving a biological agent, toxin, or vector (as those terms are defined in section 178 of this title ); or (D) any weapon that is designed to release radiation or radioactivity at a level dangerous to human life; and.

destructive device under 921

(4) The term "destructive device" means— (A) any explosive, incendiary, or poison gas— (i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the preceding clauses; (B) any type of weapon (other than a shotgun or a shotgun shell which the Attorney General finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and (C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon.

18 U.S.C. 2332b enumerates federal crimes of terrorism under 2332b(g)(5) definitions-as stated in this section. The penalties are listed under 2332b(c). Therefore, the question becomes how the terrorism enhancement can apply to 2332a when it has not one mention of terrorism in its title nor in its elements. How is it constitutional to add a terrorism element to other statutes based on a separate statue that list it as a federal terrorism crime but disregards the penalties listed in that same statute? Void for vagueness doctrine is applicable to this constitutional question.

The question also is what is an actual WMD? The definition above is quite broad, even a Molotov cocktail is a WMD and it seems feasible that many legal guns can fall

under that definition. The department of homeland security defines a WMD as nuclear, radiologic, chemical, biologic, or other device that is intended to harm a large number of people. WMD's are also considered to be nuclear weapons by the majority of Americans and are meant to decimate a large number of people.

Interestingly though you don't see airplanes. 9/11 was an actual mass attack committed with airplanes. The statutes were written in haste by Congress because of 9/11. Chapter 113B beginnings referenced foreigners committing acts on nationals of the United States either abroad or here on American soil. After McVeigh and the OKC bombing they began to reword the statutes and they are now so confusing that it is difficult to discern what is criminal. The terrorism enhancement should be deemed unconstitutional because of its structure and that it significantly increases a sentence without authorization from a jury based on *Apprendi* and *Alleyne*. "Because the legally prescribed range *is* the penalty affixed to the crime, it follows that a fact increasing either end of the range produces a new penalty and constitutes an ingredient of the offense.[15]"

Varnell should have received a departure based on the fact that the FBI created this entire crime. They could have arrested Varnell for threatening to bomb Bancfirst after the scouting. Yet, they didn't and that should be another consideration. If Varnell was guilty during this long sting then why did the government need to spend tax payers dollars to buy a van and bomb supplies? A WMD charge would not be applicable to Varnell without their significant involvement. Varnell ask this court to remove the terrorism enhancement from his case along with the intended loss calculations based under sentencing manipulation. Even the sentencing guidelines have a downward departure under USSG § 3B1.1(b)[16]. The departure recognizes that not all players are alike and sentences each person accordingly to their roles in the crime. It is inapplicable to sting cases because a person cannot be in a conspiracy with the government. This is unfair because when the Courts clearly say that the FBI was aggressive and supplied everything then the defendant should be given a reduction. Under *U.S. v. Taylor*, 579 U.S. _____(June 2022), "because no element of the offense requires proof that the defendant used, attempted to use, or threatened to use force and specifies that a court must maintain a focus on the elements rather than the facts of the

---

[15] *Alleyne v. United States*, 570 U.S. 99 (2013)

[16] SSG § 3B1.1(b). An enhancement under this section requires the involvement of at least one "participant" other than the defendant, and a "participant" is defined as a "person who is criminally responsible for the commission of the offense." United States v. Gallant, 537 F.3d 1202, 1241 (10th Cir.2008). The defendant must also exercise some degree of "decision-making authority or control over a subordinate." United States v. Pena-Hermosillo, 522 F.3d 1108, 1112 (10th Cir.2008); see also United States v. Gonzalez Edeza, 359 F.3d 1246, 1248 (10th Cir.2004) ("At bottom, '[a] supervisor is one who exercised some degree of control over others involved in the commission of the offense or . [who was] responsible for organizing others for the purpose of carrying out the crime.' ") (Quoting *United States v. Allemand*, 34 F.3d 923, 931 (10th Cir.1994)).

crime. Therefore, based on the ruling in *Taylor*, there must be an element that specifies terrorism for the Court to apply it at sentencing. *Alleyne*, explained "that a crime is defined by its sentencing range and any offense with a different range of punishment is a different crime and it must be decided by a jury." Meaning that unlawful authority being cited as having the mens rea of knowingly and maliciously cannot be the basis of tripling a defendants sentencing range based on an enhancement when terrorism wasn't an element.

> *United States v. Kahn*, No. 19-8054 (10th Cir. 2023),"Dr. Kahn appealed to the U.S. Supreme Court, raising only his instructional challenge. The Supreme Court held that § 841(a)'s "knowingly or intentionally" mens rea applied to the "except as authorized" clause of the statute, vacated the Tenth Circuit's judgment, and remanded the case for further proceedings consistent with its opinion. The parties submitted supplemental briefing, and the matter went again before the Tenth Circuit. After review, the Tenth Circuit concluded the jury instructions issued in Dr. Kahn's trial incorrectly stated the mens rea requirement of § 841(a) and the error was not harmless beyond a reasonable doubt. This prejudicial error infected all of Dr. Kahn's convictions. Therefore, Dr. Kahn's convictions were vacated."

## VIII. Varnell is Actually Innocent of the 18 U.S.C. § 2332a Charge.

Varnell is actually innocent of 2332a based on the fact that the statute should be voided for vagueness. The statute has no mens rea, instead it has been opined that unlawful authority means knowingly. Yet, the statute is ambiguous based on the words, attempted to use a WMD without lawful authority. To buy explosive material such as ANFO, the buyer must be licensed or hold a permit. The government has clear authority to buy and sell these materials and did so in the case at hand. It is a crime for a lawful person to transfer any legally obtained explosive material to a person that is unlicensed or has been adjudicated a mental defect under 18 U.S. C. § 842.[17]

---

[17] it is unlawful:(B) to distribute explosive materials to any person other than a licensee or permittee; (d) It shall be unlawful for any person knowingly to distribute explosive materials to any individual who: (6) has been adjudicated a mental defective or who has been committed to a mental institution; (p)(2) Prohibition. It shall be unlawful for any person— (A) to teach or demonstrate the making or use of an explosive, a destructive device, or a weapon of mass destruction, or to distribute by any means information pertaining to, in whole or in part, the manufacture or use of an explosive, destructive device, or weapon of mass destruction, with the intent that the teaching, demonstration, or information be used for, or in furtherance of, an activity that constitutes a Federal crime of violence;

The 10th Circuit ruled in *McVeigh* that unlawful use without authority has the criminal intent of knowingly[18]. However, that crime was not an attempt and it was completed mainly by the government. Varnell could not have acquired any materials to build a bomb without the government. Varnell did not acquire the materials and did not have dominion over them. Varnell was in proximity of the materials that the government had acquired. When it is the unauthorized use of explosives themselves that must be found as a required element under these statutes then Varnell cannot be guilty. The materials were lawfully acquired by the government. The statute is ambiguous in that aspect, as a person who has a license or permit may buy these explosives legally. When a law is so vague it violates defendant's due process rights, "the role of courts under our constitution is not to fashion a new clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *U.S. v. Davis*, 139 S. Ct. 2318 (2019).

> 18 U.S.C. 229 (a) UNLAWFUL CONDUCT.—Except as provided in subsection (b), it shall be unlawful for any <u>person</u> knowingly—(1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any <u>chemical weapon</u>; or (2) to assist or induce, in any way, any <u>person</u> to violate paragraph (1), or to attempt or conspire to violate paragraph (1).
>
> (b)EXEMPTED AGENCIES AND PERSONS.—(1) IN GENERAL.—Subsection (a) does not apply to the retention, ownership, possession, transfer, or receipt of a <u>chemical weapon</u> by a department, agency, or other entity of the <u>United States,</u> or by a <u>person </u>described in paragraph (2), pending destruction of the weapon.

Under 18 U.S.C. 229, if one has authority to buy them, own them, and use them, then they are not guilty under this statute. For instance, a licensee that legally holds these explosives for sell could become upset at the government. They may put these explosives together as they please and bomb a building. The problem prosecuting him is that the government would have to prove he used them unlawfully without authority. Yet, his defense provides that he had a license to blow things up and therefore did in fact have lawful authority. Perhaps the building he blew up was one that he owned. It was an older building that he used to sell explosives to the public but wanted to build a new one and felt under his licensed authority that it was legal. This fits the nexus of interstate commerce but the unlawful use without authority cannot attach. If he blew up

---

[18] United States v. McVeigh - 153 F.3d 1166 (10th Cir. 1998)

a building that he did not own, his defense could also claim mistaken address or that under his lawful authority he did not realize it was criminal since no mens rea element is listed. But the very bottom line is that the unlawful use without authority does not mean a person "knowingly" knew what he was doing was illegal. It is a phrase to immunize the government or licensees that have legal authority to acquire explosives and blow up buildings. Demolition companies blow buildings up and many others hold licenses to excavate earth for purposes of construction and the government may bomb anyone they seem fit, such as a terrorist overseas. The government is authorized to buy, store, and use destructive devices and WMD's just as they did in this case.

> Ruan v. U.S., 597 U.S. ___, (June 2022), held in §841 prosecutions, authorization plays a "crucial" role in separating innocent conduct from wrongful conduct. United States v. X-Citement Video, Inc., 513 U. S. 64, 73. Moreover, the regulatory language defining an authorized prescription is "ambiguous" and "open to varying constructions," Gonzales v. Oregon, 546 U. S. 243, 258, meaning that prohibited conduct (issuing invalid prescriptions) is "often difficult to distinguish" from acceptable conduct (issuing valid prescriptions). United States v. United States Gypsum Co., 438 U. S. 422, 441. A strong scienter requirement helps reduce the risk of "overdeterrence," i.e., punishing conduct that lies close to, but on the permissible side of, the criminal line. Ibid.

The statue should differentiate between who has lawful authority versus who does not or at least attach a mens rea of maliciously as in 844(I). It would be illegal for an authorized licensee to transfer or sell explosives to Varnell or even teach him how to put the materials together to create a bomb. The government is allowed to buy the explosive materials, store them, and teach Varnell how to put them together to make an explosive device. Therefore, if the government has no criminal liability for its actions one can hardly understand how the law can criminalize Varnell's behavior. Without the governments legal authority to buy the materials Varnell could not have been found guilty of these crimes. Rule of leniency requires that the statute be construed against the government.

> Constructive possession is the legal possession of an object that is not in the person's direct physical control. Like other "constructive" meanings, constructive possession legally functions as actual possession in a variety of ways.[19] Actual possession, also called possession in fact, is used to describe immediate physical contact. This case from New York, explains that "actual possession is what most of us think of as possession—that is, having physical custody or control of an object."

---

[19] https://www.law.cornell.edu/wex/constructive_possession

This case from the Eleventh Circuit, explains that *constructive possession*, also called possession in law, exists when a person has knowledge of an object plus the ability to control the object, even when the person has no physical contact with it. Constructive possession is often used in criminal cases.[20]

To buy explosives you must produce a federal permit issued by the ATF. *U.S. v. Little*, 829 F 3.d 1177, 10th Cir. (2016), held "that constructive possession exists when a person not in actual possession knowingly has the power and intent at a given time to exercise dominion or control over an object." The government maintained the entire time that they were in full control of Varnell and this operation and no one was ever in danger. After concluding that the government had legal authorization to buy the explosives and put them together, we must now decide if they still had possession over the device. Varnell was clear that he did not want to drive the van. He made many excuses for it, first it was for being a felon and then Varnell believed Elisens would be driving it. Second, on the very night of the fake bombing he argued about driving the van because he did not have a driver's license and Elisens failed to show up. Varnell never intended to drive that van anywhere but at the behest of the agent, that he would run bear bait, he was talked into it. Therefore, the government never relinquished actual possession to Varnell as they never relinquished physical control over the device which extended the lawful authority of the device.

> *Ruan*, "the Court today concludes that §841's mens rea applies to the "except as authorized" clause, which serves to separate a defendant's wrongful from proper conduct....., the Government must then prove lack of authorization by satisfying the ordinary criminal law burden of proof— beyond a reasonable doubt. Finally, the Government argues that requiring it to prove that a doctor knowingly or intentionally acted not "as authorized" will allow bad apple doctors to escape liability by claiming idiosyncratic views about their prescribing authority. But the Court has often rejected this kind of argument, see, e.g., *Rehaif*, 588 U. S., at ___, and does so again here. The Court of Appeals in both cases evaluated the jury instructions relating to mens rea under an incorrect understanding of §841's scienter requirements".

Under the defense of entrapment and outrageous government conduct this argument was never litigated. To find Varnell guilty of attempting to use a wmd without lawful authority the court needed to find that Varnell had actual possession and the attempted use was unlawful. When there is no scienter and guilt is based on "without authorization", then the element of authorized or unauthorized must be found. The court should have instructed the jury on possession to prove unauthorized use. The government had actual possession of the explosive device and their control

---

[20] https://www.law.cornell.edu/wex/possession

and dominion over the device was authorized by law because the WMD was owned by the government. The jury should have also been given an instruction on unauthorized use that required a finding that Varnell was in actual possession, and he knowingly used the device without lawful authority. The knowingly instruction was prejudicial as it was used to establish mens rea when the statue does not establish that one must knowingly use in an unauthorized manner. It simply states without authorization. A person who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction—.

> Little, "Jury instruction of possession unlawfully is used if the statute omits the element of intent to exercise control. Crucially, for our purposes, the Court observed that constructive possession is established when a person, though lacking physical custody, still has the power and intent to exercise control over the object."

> United States v. Samora, No. 19-4070 (10th Cir. 2020), "We need look no further than United States v. Simpson, 845 F.3d 1039 (10th Cir. 2017), and Benford to reach this conclusion. In each of these cases, the district court omitted the intent element of the constructive possession instruction, counsel did not object to the erroneous instruction, and we reviewed for plain error. And in each case, we held the error affected the defendant's substantial rights and therefore reversed".

> Thus, 2332a is unconstitutionally vague, in that it fails to define who is an "authorized user" and fails to provide a temporal nexus between the unlawful use and the possession of the destructive device. The statute as written must be stricken as facially void-for-vagueness and Varnell should be found innocent.

## IV. Prosecutorial Misconduct

In closing argument, the prosecution vouched for Elisens character:

> Dillion- I submit to you that Mr. Elisens -- he's a little different character than a lot of us. He seems to have had a troubled background. He's had convictions. But I think that when you reflect on his testimony, what you're going to find and remember is that "honest" seemed pretty consistent with him.

> I think that we saw in some of the messages he sent his self-deprecating humor. Even comments towards his -- I believe he said "extremely average" medium part of his anatomy. That doesn't seem to strike as somebody who is necessarily dishonest. He doesn't brag. Pages 1434-1435.

> U.S. v. Bowie, 892 F.2d 1494, 1498 (10th Cir. 1990, "Use of the "truthfulness" portions of these agreements becomes impermissible

vouching only when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony." and "It is error for the prosecution to personally vouch for the credibility of its witnesses. *United States v. Carleo,* 576 F.2d 846, 852 (10th Cir.), *cert. denied".*

*Maryland,* 373 U.S. 83 (1963) The government's withholding of evidence that is material to the determination of either guilt or punishment of a criminal defendant violates **the defendant's constitutional right to due process**.

The prosecution was also allowed to have Elisens give his opinion many times. For instance, page 310 line 6 the prosecution asks Elisens what he believes Varnell is referencing and he says the bombs. All creating an extremely prejudicial account of what truly was written within the Facebook chats. The prosecution pushing the Federal Eccles lies was an egregious error in creating extreme prejudice by misleading the jury.

*Holmes v. South Carolina* - 547 U.S. 319, (2006), "Well-established rules of evidence permit trial judges to exclude defense evidence if its probative value is outweighed by its unfair prejudice, confusion of the issues, or potential to mislead the jury. The Court noted that it had elaborated on this standard by permitting the exclusion of evidence that is "repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues". (Internal marks and citations omitted.) Rules regulating the admissibility of third-party guilt apply this principle, because this evidence is often too speculative or remotely associated with the crime. The Court observed that these rules are widely accepted,[13] and were not in and of themselves being challenged in this case.

The prosecution also allowed Elisens to lie and manipulate the evidence by consistently referring to Varnell being in charge of bombs for the Missouri survival group. The problem with that is Varnell never intended to move to Missouri to live with the group, this is very clear throughout the messages. Elisens uploaded a word document listing their roles, sot.docx, that listed Varnell as CFO, not bomb builder. It is also very clear that Varnell was to help with computer stuff and the business side of things. In the messages it is Thomas Borkus that states he can get construction equipment and acid and chemicals to build a moat. (Exhibit # 16)

*United States v. Guardia,* 135 F.3d 1326, 1331-32 (10th Cir.1998), "The danger of "confusion of the issues" and "misleading the jury" arises when circumstantial evidence would tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue in the current case."

Prosecution failing to provide the court with evidence that Elisens was threatening the media before trial. Elisens threatened to Brianna Baileys office, and he threatened the Daily Oklahoman. Both reported him to the FBI and made reports and

both were in fear of him.(Exhibit # 17) No charges filed, just like no charges filed for him assaulting a U.S. Marshall with a machete knife when they went to arrest him on the material warrant. These are all evidence of the prosecution making sure that Elisens testified as they wanted. Elisens also was harassing Varnell's mother and his counsel Marna Franklin. Lastly, the transcript that Elisens has posted on his social media about a conversation with Martin and Dillon seems to be missing from the record. During trial Elisens was also facing charges in Florida for threat, extortion, blackmail and stalking. In fact, Elisens continues to stay in trouble and has had many cases on the east coast and according to pacer under Elisens v. Auburn Community Hospital, et al, he filed lawsuits against doctors that found him mentally incompetent and had him institutionalized. Elisens also filed a case on a police officer that he claims assaulted him, ELISENS v. REYNOLDS et al. He now faces numerous charges for assaulting police. Elisens is fighting these charges by once again suing the psychiatrist under ELISENS v. MAINE STATE FORENSICS DHHS et al, because they have found him mentally incompetent. (Exhibit # 18) Elisen records his life and then uses those recordings to manipulate the evidence to prove his innocence. Elisens history is important to Varnell's defense as it helps to establish a pattern of misconduct by Elisens that he does in fact threaten people regularly and that he does in fact manipulate evidence to absolve him of wrongdoing.

## X.    FBI Perjury about Schizophrenia

Testimony was heard about Varnell's schizophrenia. However, the Courts failed to give enough weight to his mental illness being an issue because Franklin failed to do her job as an effective attorney, from her fear that the jury would think he was crazier than he was, she not only omitted evidence, but she also ignored evidence.

The 10th circuit stated in their opinion that:

United States v. Varnell, No. 20-6040 (10th Cir. 2021), Varnell's mental health, while relevant, does not tip the scales in favor of concluding his due process rights were violated, particularly since he has not shown the government was fully aware of his condition or purposefully targeted him because of it.  See United States v. Doe, 698 F.3d 1284, 1293 (10th Cir.2012) ("[T]he outrageous conduct defense focuses on the government's conduct."), Further, although there was trial testimony that in March 2017 the government became aware of an allegation Varnell suffered from schizophrenia, one of the FBI agents involved in the investigation testified she was not aware of any evidence Varnell suffered from any "schizophrenic delusion or hallucinations during the course of [the] investigation or on the day of his arrest." Having reviewed the entire record, we conclude the evidence does not show the government was

aware Varnell was suffering from symptoms associated with his mental illness during the period of its investigation.

It is clear that early in the investigation the FBI found a case in Grady County, Oklahoma and then requested the case file from District Attorney Angela Marsee. (Exhibit #19) In a response from Marsee in the Custer County case Marsee admitted to giving the FBI the file in the context of an ongoing criminal investigation. That file contained reports by police officers that stated that Varnell's wife said that he attacked her because he was suffering from a schizophrenic episode and the police officers themselves made claims that he was suffering from delusions. The officers also took Varnell to a mental facility for a 48-hour hold and not to jail. Once at the facility the psychiatrist petitioned the Court in Beckham County, Oklahoma for Guardianship to have him rendered legally mentally incapacitated and sent him to Fort Supply for inpatient treatment. Angela Marsee is not only District Attorney over Grady County but also Beckham County. The file also contained medical files that were sealed by the courts due to HIPPA privacy regulations. One particular sealed file was used numerous times by the prosecution to prejudice the court against Varnell to give the impression that Varnell's schizophrenia was faked. The FBI agents testified that they had some information early on about Varnell's schizophrenia but didn't know the full details. (Exhibits #1 & # 2) The agents perjured themselves to ensure Varnell's conviction. FBI policies state that they are to redirect mentally ill subjects. (Exhibit # 20) The law is clear that disabled persons are to be accommodated due to their disability. Yet, Marna Franklin refused to use any policy information to impeach the agent's testimony. Franklin also refused to provide any evidence to negate the prejudice by the prosecution for not only the trial Judge but also the appellate court. Franklin also failed to get copies of Varnell's Custer County case file.

The case file does not give the impression that there may be a possibility that Varnell may be suffering from some mental illness, it proves he is suffering from a mental illness. It is a detailed record of his incapacitation and has completed affidavits from the arresting officers that when they arrived at the scene, they transported him to the hospital because he was in the bathtub in a catatonic state and subsequently called an ambulance to transport him to the hospital. That after he woke at the hospital, he was clearly mentally psychotic.

Recently, the DOJ announced that they were investigating OKCPD for mental health violations.[21] "The investigation will examine whether Oklahoma fails to provide community-based mental health services to people in Oklahoma County, leading to unnecessary admissions to psychiatric facilities and police contact. The investigation

---

[21] https://www.justice.gov/opa/pr/justice-department-launches-investigation-oklahoma-s-mental-health-service-system-and

will also examine Oklahoma City's systems for responding to people experiencing behavioral health crises, including through the 911 call center and OKCPD." 10th circuit case law and the ADA maintain that police officers are to attempt diversion of mentally ill suspects versus prison unless exigent circumstances are present. The ADA authorizes two theories of recovery in the context of arrest under Tittle II: a wrongful arrest theory and a reasonable accommodation theory. The wrongful arrest theory asserts an ADA violation when police misperceive the effects of a disability as criminal activity. The misperception itself is the violation and constitutes discrimination. The reasonable accommodation theory asserts an ADA violation when police fail to reasonably accommodate an individual's disability during an arrest. This means the person is denied meaningful access or effective communication such that the objectives of law enforcement are not met. The failure of the public entity to provide reasonable accommodations violates Title II.

The FBI allowing Elisens to bring Varnell marijuana should have been a factor. When Varnell stated man what's in this it gets me bonged out of my mind and Elisens replied you're not smoking the good stuff. That was ignored by this court but should have been a factor. For instance, the University of Southern California recently issued a report about medical marijuana stating[22], "High-potency cannabis products have been linked to short-term memory and coordination issues, impaired cognitive functions, cannabis hyperemesis syndrome, psychosis, and increased risks of anxiety, depression and dependence". Schizophrenics that already have paranoia and psychosis issues are the most vulnerable according to the National Institute of Health[23],

> "Several studies have linked marijuana use to increased risk for psychiatric disorders, including psychosis (schizophrenia), depression, anxiety, and substance use disorders, but whether and to what extent it causes these conditions is not always easy to determine. Recent research suggests that smoking high-potency marijuana every day could increase the chances of developing psychosis by nearly five times compared to people who have never used marijuana. The amount of drug used, the age at first use, and genetic vulnerability have all been shown to influence this relationship. The strongest evidence to date concerns links between marijuana use and psychiatric disorders in those with a preexisting genetic or other vulnerability."

The FBI violated Varnell's right to accommodations which is why they refused to admit that they did in fact know that Varnell was schizophrenic and used it against him.

---

[22] https://healthpolicy.usc.edu/article/cannabis-regulations-inadequate-given-rising-health-risks-of-high-potency-products/

[23] https://nida.nih.gov/publications/research-reports/marijuana/there-link-between-marijuana-use-psychiatric-disorders

Not only did they fail to interview him for an intervention or attempt to redirect him, instead they sent another mentally ill man after him. The very fact that they hired a person such as Elisens to become a paid informant should be shocking enough. The prosecution during trial consistently mocked Varnell for his mental illness and worked to prejudice the Judge that he was faking it by Stoneman constantly referring to the evaluation that was not in evidence. Dillon also mocked his mother on cross by insinuating that she was making his mental health history up and that is easy to place someone in a mental hospital. Dr. Roberson testified at sentencing that the first time he interviewed Varnell that he said he was hearing voices and Roberson believed that to be true. The final evaluation by Roberson that discussed Varnell's remission was only applicable to the time of that exam not when he was arrested. Varnell's schizophrenia that has been diagnosed by numerous doctors including the BOPs should be a serious consideration in the tactics of the FBI when they committed this crime to imprison him.

**RELIEF REQUESTED**

Wherefore, the reasons stated and argued above Jerry Drake Varnell prays this Court provides relief from the sentence received of 300 months and lifetime supervision.

Respectfully Submitted,                    Dated: 3/02/2023

Signed BY: _Jerry D. Varnell_ ____ Jerry Drake Varnell #31820-064

Address:

USP Coleman I

P.O. Box 1033

Coleman, FL 33521

I hereby certify that this MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE and this BRIEF IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE 2255 was filed at the Clerk Of Court, US District Court, Western District of Oklahoma 200 NW 4th Street Oklahoma City, OK 73102, this 10th day of March, 2023.